2005 WY 108

**BRIDLE BIT RANCH COMPANY, a Wyoming Corporation; Jerry and Barbara Dilts Family Limited Partnership, a Wyoming Limited Partnership; Floyd C. Reno & Sons, a Wyoming corporation; Leland J. Turner; Karen Turner; Jennifer Louise Turner; Wendy Christine**

Turner; Karen Turner, Conservator of the Estate of Michael William Turner, (a minor); Patricia L. Isenberger Litton, formerly Patricia Louise Isenberger, and Gene Litton, Wife and Husband, Petitioners,

v.

BASIN ELECTRIC POWER COOPER-ATIVE, a North Dakota Corporation, Respondent.

Robert R. Roush and Dona M. Roush, Husband and Wife; and Innes Ranch, LLC, a Wyoming Limited Liability Company, Petitioners,

v.

Basin Electric Power Cooperative, a North Dakota Corporation, Respondent.

Nos. 04–134, 04–136.

Supreme Court of Wyoming.

Sept. 7, 2005.

Tad T. Daly and Matthew R. Sorensen of Daly Law Associates, P.C., Gillette, Wyoming, for Petitioners Bridle Bit Ranch Company, et al. Argument by Mr. Daly.

Stephen N. Sherard and Rex E. Johnson of Sherard, Sherard and Johnson, Wheatland, Wyoming, for Respondent Basin Electric Power Cooperative. Argument by Mr. Sherard.

Charles R. Hart and Lynn M. Smith of Hart & Smith, Sheridan, Wyoming; and Nancy D. Freudenthal of Davis & Cannon, Cheyenne, Wyoming, for Petitioners Robert R. Roush and Dona M. Roush, et al. Argument by Ms. Freudenthal.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

HILL, Chief Justice.

[¶ 1] Employing its powers of eminent domain, the Respondent, Basin Electric Power Cooperative (Basin), sought to condemn a right-of-way through a portion of Campbell County in order to build a 230–kilovolt (kV) power transmission line. Basin asserted that the transmission line was necessary so as to provide additional electrical power to areas of Campbell County where coal bed methane (CBM) is being developed and to otherwise enhance the availability and reliability of electrical service to that area. Basin is a regional wholesale electric generation and transmission cooperative that supplies wholesale electricity to its distribution cooperatives. Powder River Energy Corporation (PRECorp) is a Wyoming non-profit corporation and is one of Basin's distribution cooperative members. PRECorp provides electricity at retail to its customers in Northeastern Wyoming, including Campbell County.

[¶ 2] Basin was able to reach settlements with approximately 82% of the private landowners affected by the transmission line, as well as with the United States Forest Service.[1] At the time of the hearing on this stage of the condemnation action (the "taking"), Basin had not yet reached agreements with two groups of landowners, nor with The State of Wyoming, Office of State Land and Investments (State Lands), or the Bureau of Land Management (BLM).[1] Case No. 04–134 is a challenge to the district court's order granting Basin immediate possession of the lands owned by a group of landowners to whom we will refer collectively as "the Bridle Bit Group." Case No. 04–136 is a similar challenge to that same order by another group of landowners to whom we will refer as "the Roush Group."

[¶ 3] By order entered on July 13, 2004, this Court granted Petitions for Writ of Review under W.R.A.P. 13, in order to address the concerns of both groups of landowners. It was necessary for the landowners to utilize W.R.A.P. 13 because of a long-standing precedent articulated by this Court that the "taking" portion of a condemnation action is not

---

1. On July 21, 2004, the United States entered an appearance in this case, but has not otherwise participated in this matter.

an appealable order. *Arp v. State Highway Commission,* 567 P.2d 736, 739 (Wyo.1977).

[¶ 4] Both groups of landowners contend that Basin is a public utility as defined by Wyo. Stat. Ann. § 37–1–101 (LexisNexis 2005), and, thus, Basin was required to obtain a certificate of public convenience and necessity from the Public Service Commission (PSC) before beginning the process of locating the transmission line. They also contend that Basin: Failed to show that public interest and necessity required the project; failed to show that the project is planned and located in a manner that will be most compatible with the greatest public good and the least private injury; and failed to negotiate in good faith. It is also contended that the district court erred in granting a taking that is, in essence, perpetual.

[¶ 5] We will affirm the district court's order in all respects.

## ISSUES

[¶ 6] The Bridle Bit Group raises these issues:

A. Did the district court commit clear error in finding Basin located the transmission line in the manner most compatible with greatest public good and least private injury?

B. Did the district court err in finding that a perpetual easement for transmission lines is permitted under Wyoming law?

C. Did the district court err in finding that Basin was not a public utility as defined by Wyoming Statute § 37–1–101?

The Roush Group states these issues:

I. Whether the district court erred in finding [that Basin] met all the requirements of Wyoming's eminent domain statutes.

a. Did [Basin] comply with the statutory requirements for a condemnation action?

b. Is [Basin] a "public utility," and therefore, required to obtain a "certificate of public convenience and necessity" from the Public Service Commission prior to condemnation[?]

II. Whether [Basin] should be granted a limited easement or an easement in perpetuity.

We glean this more complete statement of the issues from Basin's brief:

I. Basin has complied with the statutory requirements for its condemnation action.

a) Basin has shown that the public interest and necessity require the transmission line project.

b) Basin has proved that the project is planned or located in the manner that will be the most compatible with the greatest public good and the least private injury[.]

c) Basin has made reasonable and diligent efforts to acquire property by good faith negotiation.

II. Basin is entitled to a permanent easement for its transmission line and access rights-of-way.

III. Basin [is not a public utility] and was not required to obtain a certificate of public convenience and necessity from [PSC] [before proceeding with the] condemnation action.

## FACTS AND PROCEEDINGS

[¶ 7] During the winter of 2000, Basin began looking at selecting a route for an additional power transmission line in Campbell County. By letter dated December 21, 2000, Basin submitted the following inquiry to PSC:

Basin Electric Power Cooperative (**Basin Electric**) is currently reviewing its resources for supplying wholesale power to its member Powder River Energy Corporation (**PRECORP**). PRECORP has experienced a sudden and rather substantial increase in its membership load because of the development of coal bed methane in the Powder River Basin.

While Basin Electric is considering several options for power supply, the first phase of an overall program needs to move forward expeditiously so that Basin Electric can meet its power supply obligations. Our studies show that Basin Electric needs approximately 40–50 MW [megawatt] of capacity in place in the PRECORP service territory on or before May of 2002.

To meet this need, we anticipate installing up to 15 MW of combustion turbine capacity adjacent to each of the PRECORP substations located in Arvada, Barber Creek and Hartzog for a total of 45 MW. A map of the proposed locations is attached. There will be three or four combustion turbines located at each substation, depending on the size of the units ultimately selected. The estimated cost of these facilities is $36 million.

Basin Electric[1] seeks a ruling from the Commission on whether it must obtain a Certificate of Public Convenience and Necessity under Section 37–2–204[2] of the Wyoming Statutes Annotated for the installation of these turbines.

[1] Basin Electric is a participant in the Laramie River Station that is jointly owned by Basin Electric, Tri–State Generation and Transmission Association, Western Minnesota Municipal Power Agency, Heartland Consumers Power District, the City of Lincoln, Nebraska Electric System and the Wyoming Municipal Power Agency. The Commission issued Certificates of Public Convenience and Necessity for this facility on June 24, 1976. Docket Numbers: 9548 Sub 4, 9611, 9621, 9622, 9623, 9624.

[¶ 8] On January 13, 2001, the Secretary and Chief Counsel for the PSC replied:

This responds to your letter to the Chairman of the Wyoming Public Service Commission of December 21, 2000, seeking the opinion of the Commission as to whether or not Basin Electric Power Cooperative (Basin) must obtain a certificate of public convenience and necessity from the Commission for the construction of certain electric generation facilities in the Wyoming Service territory of Powder River Energy Corporation (Powder River Energy). Specifically, Basin proposes to install up to 15 MW of combustion turbine capacity adjacent to each of the Powder River Energy substations located at Arvada, Barber Creek and Hartzog. You have stated that this will entail the placement of three or four combustion turbines at each substation depending on the size of the

units selected for placement. You estimate the cost of the facilities to be $36 million and state that the construction is needed to assist Powder River Energy in dealing with the substantial increase in demand caused by the development of coal bed methane in the Powder River Basin.

Additionally, you have told us that Basin will own and operate the facilities, selling the power produced by the units at wholesale to Powder River Energy under its all requirements contract with your cooperative. Powder River Energy is a member of Basin, and it will neither own nor operate the facilities.

Basin is not generally regulated by the Commission. Because the power sale is being made to Powder River Energy under your existing all requirements contract, and because the facilities will furnish power to Powder River Energy at wholesale rather than directly to the public, the Commission therefore concludes that Basin is not operating as an electric "public utility" as defined in W.S. § 37–1–101. W.S. § 37–2–105, concerning certificates of public convenience and necessity, requires certification by the Commission for the facility construction activities of a "public utility." As a result, the Commission will not require Basin to obtain a certificate of public convenience and necessity for the described facilities. We are not of the opinion that the membership of Powder River Energy in Basin constitutes a sufficient identity of business entities to disturb this conclusion.

[¶ 9] By letter dated March 8, 2001, Basin made the following additional inquiry of the PSC:

In Ron Harper's December letter to the Commission, he reported on Basin Electric's plans for the construction of combustion turbine generation in the Powder River Energy Corporation (**PRECorp**) service territory to support the growing coal bed methane development. Your letter of January 13 noted that a Certificate of Public Convenience and Necessity was not re-

---

**2.** This reference should be to Wyo. Stat. Ann. § 37–2–205.

quired for the construction of those facilities.

The purpose of this letter is to advise the Commission of Basin Electric's plan to construct a 230 kV transmission line to support the PRECorp area, primarily from the development of coal bed methane load growth.

Attached are three copies of a map showing the corridor for the proposed line. The 230 kV line will originate at the Teckla Substation and interconnect with the PP & L 230 kV line near the Campbell/Johnson county line. The line will be approximately 70 miles in length and cost approximately $14,000,000. We hope to have this line in service by April, 2003.

Based on your January 13, 2001 letter regarding the combustion turbines, it appears that a Certificate of Public Convenience and Necessity is not needed for this line. However, we seek the opinion of the Commission regarding the need for a Certificate.

[¶ 10] The Commission replied by letter dated March 27, 2001:

This responds to your letter to the Chairman of the Wyoming Public Service Commission of March 8, 2001, seeking the opinion of the Commission as to whether or not Basin Electric Power Cooperative (Basin) must obtain a certificate of public convenience and necessity from the Commission for the construction of a 230 kV transmission line to support the Wyoming service territory of Powder River Energy Corporation (Powder River Energy), primarily in consideration of the growth being experienced by Powder River Energy in coal bed methane-related electric loads. In your letter, you specifically state that Basin proposes to build a 230 kV electric transmission line from the Teckla substation to the PacifiCorp 230 kV line near the Campbell/Johnson County line. You state that the line will be approximately 70 miles long, that it will cost approximately $14,000,000, and that Basin's target in-service date is April 2003.

Additionally, you have represented to us that Basin will own and operate the facilities and use them mainly to fulfill the increased demands of Powder River Energy under its all requirements contract with Basin. Basin will not make any retail electricity sales in Wyoming through the facilities. We understand that Powder River Energy is a member of Basin, and it will neither own nor operate the facilities.

Basin is not generally regulated by the Commission. Because the facilities will be used to furnish power to Powder River Energy at wholesale rather than directly to the public, the Commission concludes that Basin is not operating as an electric "public utility" as defined in W.S. [§]37–1–101. W.S. § 37–2–205, concerning certificates of public convenience and necessity, requires certification by the Commission for the facility construction activities of a "public utility." As a result, the Commission will not require Basin to obtain a certificate of public convenience and necessity for the described 230 kV line. We are not of the opinion that the membership of Powder River Energy in Basin constitutes a sufficient identity of business entities to disturb this conclusion.

Please note, however, that the Commission will have safety jurisdiction over the line when it is complete under W.S. § 37–2–131(b), *supplemental safety jurisdiction of commission*, which states that:

"(b) The commission shall have safety jurisdiction over any new or existing electrical lines used by the owner to transmit electricity which is generated by the owner for resale, and which are located upon property not exclusively controlled by the owner of the line for the purpose of enforcement of the safety requirements of the National Electrical Safety Code and those safety standards adopted by the commission. This section shall not apply to any incorporated or chartered city or town established under Wyoming law or joint powers board created under the Wyoming Joint Powers Act."

This does not change our opinion that no certificate of public convenience and necessity is required for the facility because W.S. § 37–2–131(b) applies to "owners" and not to "public utilities."

[¶ 11] During 2001, Basin began the process of obtaining easements from landowners and public entities. As a part of this process, Basin had a consultant prepare an environmental assessment as required by the U.S. Forest Service and a 25–year, renewable easement was obtained from that federal agency in 2003. The record is unclear as to what, if any, compensation was paid for that easement, although it appears that the only cost associated with that easement is an application fee. The easement may be renewed. Basin was able to obtain easements from about 82% of the affected landowners, but had not as yet obtained firm commitments for easements from State Lands or the BLM. With respect to State Lands, an application for an easement had been submitted, but such an easement is not acted upon until the applicant for the easement has obtained access from all necessary private landowners. When such easements are approved by State Lands, they are generally for a period of 35 years, but may be for longer periods of time, including perpetuity. With respect to the BLM, Basin had been offered a 30–year easement that could be renewed and that easement could be for as long as 50 years. The BLM does not require the payment of compensation for the easement, nor is there a fee for the renewal process.

[¶ 12] On January 30, 2004, Basin filed a complaint for condemnation seeking to take the lands of those private landowners who had not yet settled with Basin. The initial determination as to whether a party seeking to condemn land may "take" the land in question is tried to the district court without a jury. W.R.C.P. 71.1. The district court set this matter for hearing on May 4–5, 2004. On June 9, 2004, the district court issued its Findings of Fact, Conclusions of Law and Order Authorizing Taking:

> THE COURT makes the following findings and conclusions upon consideration of the evidence presented at trial and the submission of counsel.
>
> 1. [Basin] is a non-profit, member owned, regional generation and transmission cooperative headquartered in Bismarck, North Dakota,

> 2. It generates and transmits exclusively wholesale electricity to one hundred and twenty-four non-profit member rural electric systems in nine states, including Wyoming.
>
> 3. These member distribution cooperatives, in turn, sell this electricity on a retail basis to their members located in their service territory.
>
> 4. Powder River Energy Corporation ("PRECorp"), is a member of [Basin] and generally serves the Campbell County Area.
>
> 5. PRECorp members/customers include industrial (mines, coal bed methane, farmers, ranchers and other various types of users). Over the last several years, there has been a surge of coal bed methane ("CBM") development in PRECorp's service territory.
>
> 6. [Basin] performed studies to attempt to forecast PRECorp's future load requirements. PRECorp's current load requirement is approximately 250 megawatts and it has very little capacity to obtain or provide additional electricity.
>
> 7. [Basin's] forecasts predict that in the next ten years there may be more than 150 megawatts of additional demand in PRECorp's service area. The present system is not capable of providing for the needs of this predicted load.
>
> 8. The present system of distributing electricity to PRECorp and its members involves a single corridor of supply lines and does not include a loop or grid system.
>
> 9. [Basin's] proposed transmission line must be built to meet the expected load growth, to improve the power grid stability (reliability) and to update equipment.
>
> 10. In selecting the proposed route and accesses, [Basin] considered many factors, including but not limited to, the following:
>
>> a. Tie-ins or connections to existing electrical system infrastructure.
>>
>> b. Physical limitations, such as topography, railroad crossings, existing improvements and dry lakebeds, etc.
>>
>> c. Landowner concerns.
>>
>> d. Costs of construction.

e. Reliability and safety matters (by avoiding paralleling existing high power transmission lines).

f. Minimizing the number of landowners being crossed.

g. Minimizing impact to government property.

h. Minimization of visual impact.

i. Environmental concerns.

11. The proposed route was adjusted to accommodate some landowner concerns. Other landowner concerns could not be accommodated because changes would impact other landowners, change the nature of the grid being created or otherwise result in less net benefit.

12. The proposed route largely crosses undeveloped grassland and avoids residences and other developments.

13. Federal policy is that the public good is served by avoiding federal lands with utility easements to the extent possible.

14. [Basin] considered alternate routes. The other routes would shift private impact to others or would diminish the public good by increasing cost, increasing impact on public lands or preventing installation of a loop/grid system.

15. Some of the [landowners] have electric distribution lines on their property, which have been in service in excess of 50 years.

16. [Basin] obtained time-limited easements from government entities. Those easements will be renewed at a nominal or zero cost, and the time of them does not relate to the life of the proposed power line.

17. It is not possible to determine if the proposed power line will cease to be necessary or useful at some time in the future. The line's term of service is as long as electricity is needed.

18. [Basin] attempted to negotiate a settlement with [the landowners] in order to avoid the condemnation process. Negotiations to settle with [the landowners] were conducted up through the very morning of the hearing (and several landowners then settled).

19. Over 80% of the private landowners settled with [Basin] prior to the commencement of the hearing on May 3, 2004.

20. [Basin] considered and discussed location, access, timing and price in its negotiations.

21. The final offer made by [Basin] to [the landowners] was generally as follows:

a. $85/rod for the transmission right-of-way. ($1,795.20/acre)

b. $10/rod for the road accesses to the right-of-way. ($800.00/acre)

c. Term of both rights-of-way would be limited to 99 years.

22. The range of values for the fee ownership of the types of land being sought by [Basin] is $248.00/acre for tracts of land larger than 700 acres; and $618.00/acre for tracts of land smaller than 700 acres.

23. The proposed transmission line and subsequent condemnation is necessary for the public good.

24. [Basin] is seeking only the real estate interests (easements) necessary to effectuate the construction, operation and maintenance of the line.

25. The project is planned and located in the manner that is most compatible with the greatest public good and least private injury.

26. [Basin] made reasonable and diligent efforts to acquire property by good faith negotiation.

27. The condemned easement requires an unlimited length of time, and Wyoming law provides for the same. W.S. § 1-26-515 establishes when, if ever, the condemned easement expires.

28. [Basin] provides wholesale power to PRECorp. [Basin] does not distribute energy in the retail market.

29. [Basin] does not fall within the statutory definition of a public utility in W.S. § 37-1-101 and is not subject to regulation by the Wyoming Public Service Commission.

30. [Basin] acted in good faith when it located the proposed line and negotiated with [the landowners].

31. A determination of the greatest public good and least private injury involves a balance of those factors. [The landowners] insist on the least private injury to themselves without consideration of potential injury to others or diminished public good.

32. The evidence does not show any valid reason for limiting the time of the proposed easement. [The landowners'] insistence on a term of years in reality is a claim for additional compensation after the term expires.

33. This is an action for condemnation of an interest in real property pursuant to the Wyoming Eminent Domain Act (W.S. § 1–26–501 et seq.) and WRCP 71.1.

34. The Court has jurisdiction over this action pursuant to Article 5, Section 10, Wyoming Constitution.

35. Venue is proper in this Court pursuant to W.S. § 1–5–108.

36. Public interest and necessity require this project. Although [Basin's] complaint did not specifically use this terminology, the allegations and evidence clearly established that public interest and necessity require this project.

37. Mineral development and industrial growth is in the public interest. This line is necessary to serve that public interest.

38. [Basin] is entitled to acquire easements across the property listed in its complaint by virtue of eminent domain.

IT IS, THEREFORE, HEREBY ORDERED that [Basin] is granted immediate possession of the rights of way and easements set forth in its Amended Complaint, as against all [landowners] who have not stipulated to settlement.

[¶ 13] We will include other pertinent facts as needed in order to flesh out our discussion of the issues.

## DISCUSSION

### Is Basin a "Public Utility"

[¶ 14] We will discuss the issues in a somewhat different order than as presented by the parties. Whether Basin is a "public utility," and, therefore, was required to ob-

tain a certificate of public convenience and necessity is a threshold question that must be addressed first.

[¶ 15] This issue arises because Basin contends it is not a "public utility" as contemplated by the governing statute, and because the PSC agreed with that conclusion, thus declining to require Basin to obtain a certificate of public convenience and necessity. Basin is a wholesale power provider, and is a non-profit corporation based in Bismarck, North Dakota. It is owned and controlled by its members. It serves 124 distribution cooperatives throughout a nine-state area. PRECorp is one of the members, and is the largest single user of electricity from Basin. PRECorp and other member owners then sell the electricity to their members. Thus, Basin contends it does not furnish electricity "to or for the public," but only to its member cooperatives who, in turn, furnish that electricity "to or for the public."

[¶ 16] With respect to condemnation of private land, the Wyoming Constitution provides, at art. 1, § 32:

#### § 32. Eminent domain.

Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and for reservoirs, drains, flumes or ditches on or across the lands of others for agricultural, mining, milling, domestic or sanitary purposes, nor in any case without due compensation.

[¶ 17] Wyo. Stat. Ann. § 37–2–205 (LexisNexis 2005) provides:

#### § 37–2–205. Certificate of convenience and necessity; hearings.

(a) No *public utility* shall begin construction of a line, plant or system, or of any extension of a line, plant or system without having first obtained from the commission a certificate that the present or future public convenience and necessity require or will require such construction. This act shall not be construed to require any public utility operating outside of a city or town to secure a certificate for an extension into an area within which it has lawfully commenced operation, or for an extension into territory

contiguous to its line, plant or system for which no certificate is in force and is not served by a public utility of like character or for any extension within or to territory already served by it, necessary in the ordinary course of its business. If any public utility, in constructing or extending its line, plant or system interferes or is about to interfere with the operation of the line, plant or system of any other public utility already authorized or constructed, the commission on complaint of the public utility claiming to be injuriously affected, may after hearing make such order and prescribe the terms and conditions for the location of the lines, plants or systems affected, as to it are just and reasonable. The power companies may, without the certificate, increase capacity of existing plants.

(b) **No public utility shall henceforth exercise any right or privilege or obtain a franchise or permit to exercise such right or privilege from a municipality or county, without having first obtained from the commission a certificate that public convenience and necessity require the exercise of such right and privilege; provided, that when the commission shall find, after hearing, that a public utility has heretofore begun actual construction work and is prosecuting such work in good faith, uninterruptedly and with reasonable diligence in proportion to the magnitude of the undertaking, under any franchise or permit heretofore granted but not heretofore actually exercised, such public utility may proceed to the completion of such work, and may, after such completion exercise such right or privilege; and provided, further, that this section shall not be construed to validate any right or privilege now invalid or hereafter becoming invalid under any law of this state, nor impair any vested right in any franchise or permit heretofore granted.**

(c) Before any certificate may issue, under this section, a certified copy of its articles of incorporation or charter, if the applicant be a corporation, shall be filed in the office of the commission. The commission shall have power, after hearing involving the financial ability and good faith of the applicant and the necessity of additional service in the community, to issue said certificate, as prayed for, or to refuse to issue the same, or to issue to it for the construction of a portion only of the contemplated line, plant, or system, or of a portion only, of the contemplated line, plant, system or extension thereof, or for the partial exercise only of said right or privilege, and may attach to the exercise of the rights granted by said certificate such terms and conditions as in its judgment the public convenience and necessity may require.

(d) Upon its own motion, or on complaint of any person the commission shall have power to investigate and determine whether the competitive rates, charges and service existing between any public utilities are fair, just and reasonable, after hearing thereon to determine, fix and order such rates, charges, regulations and remedies as will establish reasonable and just rates, between said competing public utilities, and between said public utilities and their customers and patrons.

(e) **Where a certificate for the construction and operation of a high voltage electric transmission line of 230 KV or greater is required, the public service commission shall publish notice of application in a newspaper of general circulation in each county where the line will be constructed. The public service commission shall give actual notice of hearing on the application by registered mail at the applicant's expense to each landowner who may be affected. The notice of hearing shall be given at least thirty (30) days before the hearing is held and shall contain a summary of the pertinent facts about the application.**

(f) **In the case of a certificate for the construction of a high voltage electric transmission line of 230 KV or greater, the issuance of *the certificate shall be conditioned so that no construction of the line is authorized until all right-of-way for the line has been acquired.***

(g) Any electric utility which provided service to any part of the annexed area

prior to annexation and which does not receive a franchise from the annexing municipality to serve the annexed area shall receive just compensation from the public or private utility franchised to serve the annexed area. If the affected utilities cannot agree on just compensation within thirty (30) days after the franchise has been issued and become final after any challenge thereto, the affected utilities shall submit the matter to arbitration before the public service commission pursuant to W.S. [§]37-2-113. Upon conclusion of the arbitration proceedings and payment of the compensation determined to be just, ownership of the facilities shall be transferred to the acquiring utility. [Emphases added.]

[¶ 18] "Public utility" is defined by Wyo. Stat. Ann § 37-1-101(a)(vi) (LexisNexis 2005):

(vi) **"Public utility" means and includes every person that owns, operates, leases, controls or has power to operate, lease or control:**

(A) Any plant, property or facility for the transportation or conveyance to or for the public of passengers or property for hire, except taxicabs operating solely in cities and towns;

(B) Repealed by Laws 1995, ch. 181, § 3.

(C) **Any plant, property or facility for the generation, transmission, distribution, sale or furnishing** *to or for the public* **of electricity for light, heat or power, including any conduits, ducts or other devices, materials, apparatus or property for containing, holding or carrying conductors used or to be used for the transmission of electricity for light, heat or power;**

(D) Any plant, property or facility for the manufacture, distribution, sale or furnishing to or for the public of natural or manufactured gas for lights, heat or power;

(E) Any plant, property or facility for the supply, storage, distribution or furnishing to or for the public of water for manufacturing, municipal, agriculture or domestic uses, except and excluding any such plant, property or facility owned by a municipality;

(F) Any plant, property or facility for the production, transmission, conveyance, delivery or furnishing to or for the public of steam or any other substance for heat or power;

(G) Any plant, property or equipment for the transportation or conveyance to or for the public of oil or gas by pipeline, or any plant, property, or equipment, used for the purpose of transporting, selling or furnishing natural gas to any consumer or consumers within the state of Wyoming for industrial, commercial or residential use, except any such plant, property or equipment used for any of the following purposes is exempted from this and all other provisions of this chapter to the extent of such use:

(I) For the transportation or sale of natural gas within or between oil and gas fields or potential oil and gas fields for residential, commercial, industrial or other use reasonably necessary in the exploration, development or operation of the field;

(II) For drilling, producing, repressuring, or other oil or gas field operations;

(III) For operation of natural gas processing plants;

(IV) For the sale of natural gas by the producer to a consumer for use in industrial or commercial plants or establishments of any kind or nature.

(H) **None of the provisions of this chapter shall apply to:**

(I) Interstate commerce except when a regulatory field has not been preempted by the United States government;

(II) To public utilities owned and operated by a municipality of the state of Wyoming, except as to that portion of a municipality owned and operated public utility, if any, as may extend services outside the corporate limits of a municipality and except that if any municipal utility owns an undivided interest in a facility for the production of electricity which is also partly owned by an agency

subject to the jurisdiction of the public service commission, the sale of electricity in excess of the participating municipalities' need is subject to this act;

(III) To farmers' mutual telephone associations having no capital stock and furnishing service to members of associations only and without tolls, except as provided in W.S. [§]37–2–205;

(IV) To mutual water companies or associations having no capital stock and furnishing water service to members of companies or associations only, and without charges other than assessments of members to reimburse companies or associations for expenses incurred in their establishment or operation;

(V) To any person who is not otherwise affiliated with a utility, that owns, leases, controls or has power to lease or control any plant, property or facility which, in a transaction approved or authorized by the commission, is leased to one (1) or more public utilities, and is to be operated by the lessee or lessees for the generation, transmission, distribution, sale or furnishing to or for the public of electricity for light, heat, power or other utility purposes;

(VI) **To the generation, transmission or distribution of electricity, or to the manufacture or distribution of gas, or to the furnishing or distribution of water, nor to the production, delivery or furnishing of steam or any other substance, by a producer or other person, for the sole use of a producer or other person, or for the use of tenants of a producer or other person and not for sale to others. Such exemptions shall not apply to metered or other direct sales of a utility commodity by a producer or other person to his tenants.**

(J) The term "public utility" shall mean and include two (2) or more public utilities rendering joint service;

(K) Any person furnishing coal, water or other raw materials to an electric power company shall not by this fact alone be designated as a public utility;

(M) The provisions of [§§]W.S. 37–6–101 through 37–6–106, relating to the issuance and sale of securities shall not apply to:

(I) Any gas pipeline corporation making direct sales to Wyoming consumers in interstate commerce and not for resale;

(II) Any cooperative electrical generation and transmission association operating in interstate commerce whose rates are not regulated by the Wyoming public service commission. [Emphases added.]

[¶ 19] Wyo. Stat. Ann. § 1–26–815 (LexisNexis 2005) provides:

**§ 1–26–815. Right of eminent domain granted; ways of necessity for authorized businesses; purposes; extent.**

(a) *Any person, association, company or corporation authorized to do business in this state may appropriate by condemnation a way of necessity over, across or on so much of the lands or real property of others as necessary for the location, construction, maintenance and use of* reservoirs, drains, flumes, ditches including return flow and wastewater ditches, underground water pipelines, pumping stations and other necessary appurtenances, canals, *electric power transmission lines and distribution systems,* railroad trackage, sidings, spur tracks, tramways, roads or mine truck haul roads required in the course of their business for agricultural, mining, exploration drilling and production of oil and gas, milling, electric power transmission and distribution, domestic, municipal or sanitary purposes, or for the transportation of coal from any coal mine or railroad line or for the transportation of oil and gas from any well.

(b) The right of condemnation may be exercised for the purpose of:

(i) Acquiring, enlarging or relocating ways of necessity; and

(ii) Acquiring easements or rights-of-way over adjacent lands sufficient to enable the owner of the way of necessity to construct, repair, maintain and use the structures, roads or facilities for which the way of necessity is acquired.

(c) A way of necessity acquired hereunder shall not exceed one hundred (100) feet in width on each side of the outer sides or marginal lines of the reservoir, drain, ditch, underground water pipeline, canal, flume, power transmission line or distribution system, railroad trackage, siding or tramway unless a greater width is necessary for excavation, embankment or deposit of waste from excavation. In no case may the area appropriated exceed that actually necessary for the purpose of use for which a way of necessity is authorized.

[¶ 20] Wyo. Stat. Ann. § 1–26–816 (LexisNexis 2005) provides:

### § 1–26–816. Condemnation and certificate of public necessity and convenience.

No person shall institute a condemnation proceeding relating to any facility for which a certificate of public necessity and convenience is required until the certificate has been issued.

 [¶ 21] Our analysis of this issue is guided by our traditional rules of statutory construction:

Our standard of review with respect to the construction of statutes is well known. In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed in *pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute in *pari materia.* When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. *Wyoming Board of Outfitters and Professional Guides v. Clark,* 2001 WY 78, ¶ 12, 30 P.3d

36, ¶ 12 (Wyo.2001); *Murphy v. State Canvassing Board,* 12 P.3d 677, 679 (Wyo. 2000). Moreover, we must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation. *Billis v. State,* 800 P.2d 401, 413 (Wyo.1990) (citing *McGuire v. McGuire,* 608 P.2d 1278, 1283 (Wyo.1980)).

Moreover, we will not enlarge, stretch, expand, or extend a statute to matters that do not fall within its express provisions. *Gray v. Stratton Real Estate,* 2001 WY 125, ¶ 5, 36 P.3d 1127, ¶ 5 (Wyo.2001); *Bowen v. State, Wyoming Real Estate Commission,* 900 P.2d 1140, 1143 (Wyo. 1995).

*In Re Loberg,* 2004 WY 48, ¶ 5, 88 P.3d 1045, 1048 (Wyo.2004); *Board of County Commissioners of Teton County v. Crow,* 2003 WY 40, ¶¶ 40–41, 65 P.3d 720, 733–34 (Wyo.2003).

[¶ 22] In addition, when a particular interpretation has been placed on a statute by the courts, it is presumed that the legislature has acquiesced in that interpretation where it has left the statute materially unchanged at its subsequent meetings. 82 C.J.S. *Statutes* § 310, at 397 (1999); and see *Terex Corp. v. Hough,* 2002 WY 112, ¶ 13, 50 P.3d 317, 322 (dissenting opinion) (Wyo.2002).

 [¶ 23] As a private corporation, Basin may condemn private property to obtain a right-of-way (way of necessity) across the lands of other private persons and entities. Wyo. Stat. Ann. § 1–26–815. The landowners argue here that Basin cannot be pursuing a private interest and, at the same time, argue that its business is vested with a public interest. However, the statute does not appear to preclude such a circumstance. The Wyoming Constitution does not prohibit such a "taking," and the landowners involved in this litigation do not make such an argument. Such a condemnation may not proceed if a certificate of public necessity is required. Wyo. Stat. Ann. § 1–26–816. A certificate of public convenience and necessity is required only if Basin is a "public utility." Wyo. Stat. Ann. § 37–2–205. The thorny part of this issue can be summed up as this (although there is a bit more to it, this summation captures the essence of the question): In

order to be classified as a "public utility," it must be concluded that Basin operates a facility for the transmission, "to or for the public, of electricity." Basin's argument is based upon its identification of itself as an electricity "wholesaler," that does not directly sell or transmit electricity "to or for the public." Rather, Basin sells electricity wholesale and it is only PRECorp that makes sales or transmits the electricity "to or for the public."

[¶ 24] In the case, *Phillips Petroleum Company v. Public Service Commission*, 545 P.2d 1167, 1171–72 (Wyo.1976) we held as follows:

This leaves for our disposal the question of whether Phillips' sale to Panhandle, and the delivery of a portion thereof to K–N, constitutes transportation "to or for the public." The PSC relies upon the position that this phrase is applicable if the gas is *ultimately* sold to Wyoming consumers, which is a part of the regulatory scheme of some statutes. It does not, however, require much imagination to suggest that if jurisdiction may be based upon this broad theory, it is possible to follow any producer's line to the Christmas tree. This court is confined to the statute and must stay within its bounds. We would engage in a judicial process of legislative amendment if we were to insert the word "ultimate" or "ultimately" into this statute, and this is without our province, *Lo Sasso v. Braun*, Wyo., 386 P.2d 630, 631; so we are confined to determining the proper definition of "to or for the public." We find one contention of the appellee-McCulloch of particular interest and applicability herein when it suggests that the FPC's "regulatory authority attaches to sales made at the tailgate." This position is not consistent with a finding that Panhandle is a consumer, which would create jurisdiction in the PSC. This court has not had occasion to directly define or decide what the term "to or for the public" means in connection with the jurisdiction of the PSC. However, in the case of *State Board of Equalization v. Stanolind Oil & Gas Co.*, 54 Wyo. 521, 94 P.2d 147, which was a tax case, the question was presented whether Stanolind was operating as a public utility for tax pur-poses. Under the then statute, which included the words "to and for the public," this court held that although the company bought natural gas which it conveyed by a pipeline in which it had some ownership and thereafter delivered the gas to a refinery in Casper to which it was sold, and the refinery used and consumed the gas in its operation, this was not "for the public," 94 P.2d at 156, and it could not be considered a public utility. That case further indicated that another factor for consideration is whether the company has offered to furnish the public with services or has ever filed or posted any rates or held itself out to serve consumers, generally absent here.

The words "to the public" used in the statute regulating public utilities have been defined as "sales to sufficient of the public to clothe the operation with a public interest," *Iowa State Commerce Commission v. Northern Natural Gas Company*, Iowa, 161 N.W.2d 111, 115; *Griffith v. New Mexico Public Service Commission*, 86 N.M. 113, 520 P.2d 269, 272. See *City of St. Louis v. Mississippi River Fuel Corporation*, 8 Cir., 97 F.2d 726, 728–729, for a discussion of the term "public use." Inasmuch as the record here reveals not sales to the public but only to Panhandle, Phillips cannot be classified as a public utility under our statutes. The statutes of the various states defining and regulating what is a public utility are phrased in many different and varying ways. It is difficult to find direct authority for interpretation of our statute. The writer can agree that the theory of the PSC could be sustained under some of these decisions, but the theory here asserted, being that if the gas transported is ultimately used by the public this would grant them jurisdiction, is a change in the rationale of the statutory scheme, in the writer's view. Under a statute which defined a utility as one operating a system "of supplying the public for domestic, mechanical or public uses," the Colorado Supreme Court held this did not create jurisdiction, and that it did not come under the jurisdiction of the Commission, although it sold gas directly to eleven different consumers on contract, several of

whom bought part of this gas for resale, *Public Utilities Commission v. Colorado Interstate Gas Company,* 142 Colo. 361, 351 P.2d 241.

Under the preceding authorities it is our view that this sale of gas was not "to and for the public use." Although uttered in a different context, the writer views a statement in the case of *Weaver v. Public Service Commission of Wyoming,* 40 Wyo. 462, 278 P. 542, 550, as a worthwhile caveat when broad assertions are made to determine the status of a private carrier to be that of a public utility. The court said: " * * * that a private carrier may not, in view of the Fourteenth Amendment of the United States Constitution, be converted into a common carrier against his will, * * * "

It is difficult to see the need or necessity for control or how the public will be secured any protection insofar as Wyoming consumers are concerned because this gas is sold to Panhandle, who acts merely as a wholesaler to K–N, and when that company distributes to Wyoming consumers its prices and operations are certainly under the control and regulation of the PSC.

[¶ 25] The *Phillips* case is instructive in these circumstances. However, in its discussion that court acknowledged that the case had not been well briefed by the parties, although the Court did undertake its own considerable research effort. In the instant case, the parties have provided little more than superficial analysis, and very little in the way of the recitation of pertinent authority. The facts of the *Phillips* case are certainly more attenuated than those of the instant case, but the Court did observe that similar statutes in other states were more limiting than that of Wyoming's, e.g., "directly or indirectly to or for the public," rather than just "to or for the public." We do note, however, to borrow a phrase from the *Phillips* case, that it is quite a bit easier in these circumstances "to follow [the] producer's line to the Christmas tree," than it was in the *Phillips* case.

[¶ 26] There is another Wyoming case that is instructive wherein we construed the phrase "to or for the public," although it dealt with a sales tax statute. In that case, we held that an electricity provider similarly situated to PRECorp, did provide electricity "to or for the public." *Rural Electric Company v. State Board of Equalization,* 57 Wyo. 451, 120 P.2d 741 (1942); *rehearing denied* 57 Wyo. 451, 122 P.2d 189 (1942). Certainly, the *Rural Electric* case, contemplated a broader meaning for the phrase "to or for the public," than does the more modern case of *Phillips.*

[¶ 27] There is a significant body of case law that is pertinent to this discussion, although we will not attempt to exhaustively catalogue it here. We will note that the results of many of the pertinent cases vary considerably depending upon the exact wording of the applicable statutes, as well as the availability of any statutory purpose/intent clauses and/or legislative history. Many of the cases are quite old. Some of those cases may no longer accurately discuss the status of the existing law within the jurisdiction because of subsequent changes to statutes. Also, it can probably safely be said that in most jurisdictions the construction of a power transmission line of this magnitude could not be undertaken without some oversight from a regulatory body such as Wyoming's PSC.

[¶ 28] Before we begin our summary of some of the pertinent case law, it is worthwhile here to provide a general summary of the purposes of an administrative body such as the PSC:

Public service or public utilities commissions are created for the accomplishment of public purposes. The function and purpose of a utility commission is in general to supervise, regulate, and control public utilities within its authority. They are also intended to safeguard the interests of the utilities and of the public, though their primary purpose is to serve the interests of the public.

73B C.J.S., *Public Utilities* § 149 at 400–1 (2004).

[¶ 29] In the case, *Bethlehem Steel Corporation v. Pennsylvania Public Utility Commission,* 713 A.2d 1110, 1114–15 (Pa. 1998), it was held that where gas was sup-

plied to a single end user (corporate entity), there was no public involvement and the sale was not "to or for the public." That court went on to comment that it was for the legislature, and not the courts, to determine what business activity comes within the purview of the regulatory body. In the case, *Appeal of Zimmerman*, 141 N.H. 605, 689 A.2d 678, 683 (1997), the court held that an entity that provided telecommunications services for all building tenants was not a public utility because those services were not offered to "all comers without discrimination." In the case, *Osage Water Company v. Miller County Water Authority, Inc.*, 950 S.W.2d 569, 574–75 (Mo.App. S.D.1997) (collecting cases), the court opined that " 'in determining whether a corporation is or not a public utility, the important thing is, not what its charter says it may do, but what it actually does.' " Continuing, that court found a water company to be a public utility because it sold "water to the public for compensation, and its actions suggest that it has undertaken the responsibility to provide water service to all members of the public within its capabilities." In the case, *Waltman v. Public Utility Commission*, 142 Pa.Cmwlth. 44, 596 A.2d 1221, 1223–24 (1991), the court applied this test to whether utility services were being offered "for the public:"

> [W]hether or not such person holds himself out, expressly or impliedly, as engaged in the business of supplying his product or service to the public, as a class, or *to any limited portion of it*, as contradistinguished from holding himself out as serving or ready to serve only particular individuals. [Emphasis in original.]

[¶ 30] In the case *Arkansas Charcoal Company v. Public Service Commission*, 299 Ark. 359, 773 S.W.2d 427, 429–31 (1989), the court held that the phrase "to or for the public" did not include the sale of natural gas, via a pipeline that had been condemned for that purpose, to a single end user. Applying a broad definition, the court in *State ex rel. Utilities Commission v. Mackie*, 79 N.C.App. 19, 338 S.E.2d 888, 893–94 (1986) concluded that an individual providing water and sewer service to a very limited number of customers was a "public utility" providing service "to or for the public."

[¶ 31] We conclude that the district court did not err as a matter of law in deciding that Basin was not required to seek and obtain a certificate of public convenience and necessity before undertaking the disputed project. To a limited extent, the district court's conclusion is a mixed question of law and fact. To the extent that it is, the facts clearly support a conclusion that Basin does not supply electricity "to or for the public" as contemplated by the governing statute. Our decision in *Phillips* supports that conclusion, and we are not inclined to reconsider its wisdom under the circumstances of this case, although the circumstances here are different from those circumstances presented by *Phillips*. As we have set out above, there is authority that is in accord with *Phillips*. We also note that our decision in *Phillips* is now a long-standing one, and any alteration of it, or clarification of that statute, is properly a question for the legislature.

## Did Basin Comply With Condemnation Statutes

[¶ 32] The condemnation process is governed by statute. Wyo. Stat. Ann. § 1–26–503 (LexisNexis 2005) provides:

**§ 1–26–503. Public use required; other acquisitions.**

(a) Nothing in this act requires that the power of eminent domain be exercised to acquire property. Whether property necessary for public use is to be acquired by purchase, other means or by eminent domain is a decision left to the discretion of the person authorized to acquire the property.

(b) Subject to any other statute relating to the acquisition of property, any person or public entity authorized to acquire property for a particular use by eminent domain may also acquire the property for the use by grant, purchase, lease, gift, devise, contract or other means.

[¶ 33] Wyo. Stat. Ann. § 1–26–504 (LexisNexis 2005) provides:

**§ 1–26–504. Requirements to exercise eminent domain.**

(a) Except as otherwise provided by law, the power of eminent domain may be exercised to acquire property for a proposed use only if all of the following are established:

(i) **The public interest and necessity require the project** or the use of eminent domain is authorized by the Wyoming Constitution;

(ii) The project is planned or located in the manner that will be **most compatible with the greatest public good and the least private injury;** and

(iii) The property sought to be acquired is necessary for the project.

(b) Findings of the public service commission, the interstate commerce commission and other federal and state agencies with appropriate jurisdiction are prima facie valid relative to determinations under subsection (a) of this section if the findings were made in accordance with law with notice to condemnees who are parties to the condemnation action and are final with no appeals from the determinations pending. [Emphasis added.]

[¶ 34] Wyo. Stat. Ann § 1–26–509 (LexisNexis 2005) provides:

§ 1–26–509. **Negotiations; scope of efforts to purchase.**

(a) A condemnor shall make reasonable and diligent efforts to acquire property by good faith negotiation.

(b) **In attempting to acquire the property by purchase under W.S. [§]1–26–510, the condemnor, acting within the scope of its powers and to the extent not otherwise forbidden by law, may negotiate and contract with respect to:**

(i) **Any element of valuation or damages recognized by law as relevant to the amount of just compensation payable for the property;**

(ii) **The extent or nature of the property interest to be acquired;**

(iii) **The quantity, location or boundary of the property;**

(iv) The acquisition, removal, relocation or disposition of improvements upon the property and of personal property not sought to be taken;

(v) The date of proposed entry and physical dispossession;

(vi) The time and method of payment of agreed compensation or other amounts authorized by law; and

(vii) Any other terms or conditions deemed appropriate by either of the parties. [Emphasis added.]

[¶ 35] Wyo. Stat. Ann. § 1–26–510 (LexisNexis 2005) provides:

§ 1–26–510. **Preliminary efforts to purchase.**

(a) Except as provided in W.S. [§]1–26–511, an action to condemn property may not be maintained over timely objection by the condemnee unless the condemnor made a good faith effort to acquire the property by purchase before commencing the action.

(b) **Negotiations conducted in substantial compliance with W.S. [§§]1–26–509(b)(i) through (vi) are prima facie evidence of "good faith" under subsection (a) of this section.** [Emphasis added.]

[¶ 36] Wyo. Stat. Ann. § 1–26–515 (LexisNexis 2005) provides:

§ 1–26–515. **Abandonment, nonuse or new use.**

Upon abandonment, nonuse for a period of ten (10) years, or transfer or attempted transfer to a use where the transferee could not have condemned for the new use, or where the new use is not identical to the original use and new damages to the landowner whose property was condemned for the original use will occur, any easement authorized under this act terminates.

[¶ 37] The Bridle Bit Group contends that Basin did not locate the transmission line in a manner most compatible with the greatest public good and the least private injury. Wyo. Stat Ann. § 1–26–504(a)(ii). This is based on Basin's admitted decision to avoid public lands in favor of private lands as one factor used in selecting the route ultimately chosen. Other routes were available to Basin that used somewhat more public land, but Basin chose a route that included only a small amount of public land. The Bridle Bit

Group asserts that this decision by Basin was arbitrary and capricious, as well as an act made in bad faith and constituted an abuse of its discretion with respect to the location of the transmission line.

[¶ 38] The Roush Group contends that Basin failed to demonstrate that public interest and necessity require the project at issue and that Basin's proposed route does not comply with the requirement that the project be located so as to do the greatest public good and the least private harm. Wyo. Stat. Ann. § 1–26–504(a)(i) and (ii). Those landowners contend that the project is designed solely for the benefit of PRECorp so that it can provide electricity for CBM development, but that there is no evidence that the public interest and necessity require the project. They also iterate the Bridle Bit Group's contentions concerning the greatest public good and the least private harm. Further, the Roush Group asserts that Basin failed to negotiate in good faith as required by Wyo. Stat. Ann. § 1–26–509. This argument is premised on a theory that Basin selected the route it wanted and, thus, for all intents and purposes the route was not negotiable once the process of acquiring the necessary land got underway. They also contend that Basin refused to negotiate the term of the easements and insisted on easements that were perpetual in duration.

[¶ 39] Basin contends that the route was chosen after considerable thought and study, and that it listened to the concerns of landowners. Basin considered the following factors in selecting the route now at issue: (a) Tie-in or connections to the existing electrical system infrastructure; (b) physical limitations, such as topography, railroad crossings, existing improvements, and dry lakebeds; (c) landowner concerns; (d) costs of construction; (e) reliability and safety matters (e.g., avoiding paralleling existing high power transmission lines); (f) minimizing the number of landowners being crossed; (g) minimizing impact to government property; (h) minimization of visual impact; (i) environmental concerns; (j) avoidance of archeological sites; and (k) avoidance of cultivated property. Basin ascertained that, given that the transmission line was necessary, the proposed route (and the bottom line is that it had to pick a route) was the most compatible with the greatest public good and the least private injury. Basin asserts that no evidence to the contrary was brought to bear by the landowners. Furthermore, Basin contends that its evidence establishes that public interest and necessity do require the transmission line project. Without it, Basin asserts, it cannot meet its projected demands from its users (including mineral developers, farmers and ranchers). Basin also maintains that it enjoys considerable discretion in selecting an appropriate route. Basin contends that the landowners have marshaled no evidence that Basin abused the discretion accorded it by the eminent domain statutes. Basin acknowledges that it endeavored to avoid public lands, but ultimately was unable to do so. Thus, that matter became a nonissue because Basin was required to complete an Environmental Assessment in order to obtain access to both Forest Service and BLM lands. Finally, Basin claims that it negotiated in good faith with all landowners.

[¶ 40] The standard of review applicable to these arguments has been articulated with clarity. In the case, *Conner v. Board of County Commissioners, Natrona County*, 2002 WY 148, ¶ 8, 54 P.3d 1274, 1278–79 (Wyo.2002) we set out that standard:

> Eminent domain proceedings are authorized by constitutional and statutory provisions and governed by W.R.C.P. 71.1. The district court determines all issues arising on the complaint for condemnation including notice, the plaintiff's right to make the appropriation, plaintiff's inability to agree with the owner, the necessity for the appropriation, and the regularity of the proceedings. W.R.C.P. 71.1(e)(2)(A). Only the issue of compensation may be tried before a jury. W.R.C.P. 71.1(j).

> When we review the district court's determination of issues required by Rule 71.1(e)(2), "we uphold the judgment if there is evidence to support it, and in doing so we look only to the evidence submitted by the prevailing party and give to it every favorable inference which may be drawn therefrom, without

considering any contrary evidence." *Town of Wheatland v. Bellis Farms, Inc.,* 806 P.2d 281, 284 (Wyo.1991). Where the district court's ultimate conclusions decide questions of law, we afford no deference to its decision. *See Coronado Oil Co. v. Grieves,* 603 P.2d 406, 410 (Wyo.1979); *see also Homesite Co. v. Board of County Comm'rs of Laramie,* 69 Wyo. 236, 240 P.2d 885, 889 (1952).

*Wyoming Resources Corporation v. T-Chair Land Company,* 2002 WY 104, ¶¶ 7-8, 49 P.3d 999, ¶¶ 7-8 (Wyo.2002).

[¶ 41] The *Conner* case also iterated:

When a condemnor seeks to establish the requirement of necessity in an eminent domain proceeding, it need only show a reasonable necessity for the project. As explained by one court, the term "necessity," when used in the context of an eminent domain proceeding, means "reasonably convenient or useful to the public." *City of Dayton v. Keys,* 21 Ohio Misc. 105, 252 N.E.2d 655, 659 (1969). A showing that the project will increase public safety is sufficient. *See Greasy Creek Mineral Company v. Ely Jellico Coal Company,* 132 Ky. 692, 116 S.W. 1189 (1909).

*Board of County Commissioners of Johnson County v. Atter,* 734 P.2d 549, 553 (Wyo.1987). And further:

To comply with W.S. [§]1-26-504(a)(ii), the [board] needs to present evidence that it has planned or located the project in a manner most compatible with the greatest public good and the least private injury. The district court then reviews the evidence and decides whether the [board] has met its burden. Once W.S. [§]1-26-504(a)(ii) has been complied with and the landowners still wish to contest the action, the burden shifts to them to show that the condemnor acted in bad faith or abused its discretion as to that particular determination.

*Town of Wheatland v. Bellis Farms, Inc.,* 806 P.2d 281, 283 (Wyo.1991) (footnotes omitted). Before filing an eminent domain complaint, a condemnor must make reasonable, diligent, and good faith efforts to negotiate with the condemnee. Wyo. Stat. Ann. § 1-26-509 (LexisNexis 2001). Efforts made in compliance with the statutes constitute prima facie evidence of the condemnor's good faith. Wyo. Stat. Ann. § 1-26-510 (LexisNexis 2001).

54 P.3d at 1282-83.

[¶ 42] In *Wyoming Resources Corporation v. T-Chair Land Company,* 2002 WY 104, ¶¶ 13-14, 49 P.3d 999, 1003-04 (Wyo. 2002) we held:

The taking of private property for a private way of necessity is recognized as valid in Wyoming because "[t]here is a public interest in giving access by individuals to the road and highway network of the state as a part and an extension thereof for economic reasons and the development of land as a resource for the common good, whether residential or otherwise." *Hulse v. First American Title Co. of Crook County,* 2001 WY 95, ¶ 30, 33 P.3d 122, ¶ 30 (Wyo.2001). "[T]he right to condemn a way of necessity under constitutional and statutory provisions is an expression of public policy against landlocking property and rendering it useless." *Id.; see Coronado Oil Co.,* 603 P.2d at 410.

The legislature has enacted the eminent domain and private road establishment acts so that access will be available to permit mineral estate owners to realize the full benefit of their property ownership and landlocked property will not be rendered useless.

**Did Basin Demonstrate Public Interest and Necessity**

■ [¶ 43] It is evident from the above-described standard of review that this Court has ascribed a broad meaning to the phrase "public interest and necessity," and that is consistent with the overall tenor of Wyoming's eminent domain statutes. *See* 2A *Nichols on Eminent Domain,* § 7.02[3] at 7-29—7-35 (3rd ed.2004); and 29A C.J.S. *Eminent Domain* § 29 (1992). *Nichols* identifies three core criteria for this analysis: "(1) That the taking affect a community as distinguished from a single individual; (2) That the use to which the taken property is applied is

authorized by law; (3) That the title taken not be invested in a person or corporation as private property to be used and controlled as private property unless the public receives some public benefit as a result of the private possession." 2A *Nichols,* § 7.02[3] at 7–35.

[¶ 44] The evidence presented by Basin plainly demonstrated the need for additional electric power to PRECorp's service territory and that additional power would inure to the benefit of the public in that locality, both in terms of the additional power itself and the reliability of service in the area. The landowners presented no evidence to contradict Basin's comprehensive studies that established the ever-increasing demand for more electric power. The district court's findings that Basin demonstrated that the project was necessary and in the public interest is unassailable and we affirm it here.

**Did Basin Demonstrate That the Project Was Most Compatible With the Greatest Public Good and Least Private Harm**

■ [¶ 45] The landowners' argument in this regard focuses almost entirely on Basin's decision to avoid public lands. However, the record is replete with evidence that Basin considered many alternative routes and finally settled on the one at issue here for .a variety reasons, one of which was the avoidance of public lands. We must begin our analysis with a recognition that:

> Even when judicial review of the question of necessity is based upon alleged arbitrariness or excessiveness of the taking, it has been held that by virtue of the delegation of the power of eminent domain by the state to the condemnor there is necessarily left largely to the latter's discretion the location and area of the land to be taken. And one seeking to show that the taking has been arbitrary or excessive shoulders a heavy burden of proof in the attempt to persuade the court to overrule the condemnor's judgment.

1A *Nichols on Eminent Domain,* § 4.11[2] at 4–191—4–194 (3rd ed.1998); 8A Nichols on Eminent Domain, § 26.03, at 26–25—26–47 (3rd ed.1998); *also see* Annotation, *Eminent Domain: Review of Electric Power Company's Location of Transmission Line for* *Which Condemnation is Sought,* 19 A.L.R.4th 1026, 1030–31 (1983 and Supp. 2004) ("... [T]he courts have been quite reluctant to overturn a site determination by a power company unless the evidence clearly established an unreasonable disregard of individual or public interests.").

[¶ 46] Again, the record amply demonstrates that Basin did examine several alternate routes, but ultimately had to make a decision as to which one best fulfilled all of the various criteria that went into making a decision to move forward with the project and begin the process of acquiring the necessary rights-of-way and access easements. Several years have been devoted to that effort. An examination of the map of the proposed route, as well as an examination of a map showing the alternative routes, demonstrates that the route chosen is, on its face, a direct and reasonable route. The variations between it and the alternative routes (and the variation included such things as overall mileage and federal lands crossed) are minimal, and Basin's evidence included testimony that the differences were inconsequential in the decision-making process.

[¶ 47] We conclude that the district court's determination that the transmission line was located in such a manner so as to be the most compatible with the greatest public good and the least private harm is correct.

**Did Basin Negotiate in Good Faith**

■ [¶ 48] The landowners contend that Basin did not negotiate in good faith as required by the statute. There is little, if any, dispute that Basin negotiated in good faith with respect to the amount of money to be paid for the easements and accesses. Of course, what payments will be made to the landowners involved in these appeals is not yet determined. Basin is on the record as having agreed that it will pay all landowners who settled early-on the same per-acre damages as will ultimately be paid to the landowners involved in these appeals, should it be greater than that negotiated prior to these proceedings. Basin negotiated with all landowners over a period in excess of a year (in some instances longer), and those negotiations continued up until the day of trial.

Indeed, several additional landowners settled just before trial.

[¶ 49] The sticking points in the final negotiation process were the location of the transmission line, as well as the term for the easements and accesses, i.e., that they were to be perpetual or for as long as they were needed for the transmission line. The record establishes that just prior to trial, Basin agreed to settle for easements with a duration of 99 years, rather than perpetuity.

[¶ 50] We have held above that Basin had great discretion with respect to the location of the transmission line. In addition, we note that Basin attempted to accommodate owner concerns about location, especially early on in the negotiation process. As Basin settled with more and more landowners, it became ever more difficult to accommodate the concerns of the remaining landowners without then making alterations to other settled portions of the route. The record contains seven voluminous exhibits that detail the contacts Basin had with each of the landowners involved in these appeals. We note that those exhibits amply demonstrate Basin's good faith efforts to negotiate with all landowners, to the extent that was practicable. We have carefully examined those exhibits, as well as the transcripts as a whole, and are fully satisfied that Basin did negotiate with all landowners in good faith. *See generally,* Michael A. DiSabatino, Annotation, *Sufficiency of Condemnor's Negotiations Required as Preliminary to Taking in Eminent Domain,* 21 A.L.R.4th 765 (1983 and Supp.2004); and 6 *Nichols on Eminent Domain,* § 24–14 (3rd ed.2002). The district court was correct in concluding that Basin negotiated in good faith, as required by the governing statutes.

[¶ 51] We will further discuss the issue of the perpetual term for the easements in the final section of this opinion.

### Should the Easements Be Perpetual

[¶ 52] We embark on this discussion with a reference to Wyo. Stat. Ann. § 1–26–515, which provides for the termination of condemned easements, such as those at issue here, because of nonuse, upon certain transfers or attempted transfers of the easement by the condemnor, and where a new use is not identical to the original use. The landowners contend that since the Forest Service will give only a 25–year easement, the State a 35–year easement, and the BLM a 30–year easement, their property should not be saddled with perpetual easements. Although the circumstances with the State are somewhat different, with both the Forest Service and the BLM renewal of the easement is a matter of formality and does not require the payment of additional compensation. It is the goal of the landowners (who apparently might settle for a 50–year term) to require that compensation be renegotiated after, e.g., 50 years, so that future generations will derive benefit from the land as well.

[¶ 53] The district court did not characterize the easements as perpetual. Rather it found that the easements would be required for "an unlimited length of time." Evidence adduced at trial showed that existing electrical transmission infrastructure had been in place for over 50 years and would continue to be needed for the indefinite future. As a general rule, easements may be perpetual, or for an indefinite duration, or for so long as they are needed for their intended purpose or so long as the necessity continues. 4 *Powell on Real Property* § 34.19, at 34–179—34–184 (2001); 25 Am.Jur.2d *Easements and Licenses* § 94 (2004).

[¶ 54] The landowners have not cited pertinent authority that convinces us that the district court erred in determining that the easements were for an indefinite period of time, although they are, of course, limited by a use consistent with Wyo. Stat. Ann. § 1–26–515.

### CONCLUSION

[¶ 55] We conclude that Basin is not a public utility as contemplated by the governing statute, and that the district court did not err in ordering the takings at issue in these appeals. The order of the district court is affirmed in all respects.