# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 95

APRIL TERM, A.D. 2020

July 23, 2020

EOG RESOURCES, INC.,

Appellant
(Plaintiff),

v.

S-20-0013

FLOYD C. RENO & SONS, INC.,

Appellee
(Defendant).

*Appeal from the District Court of Campbell County*
*The Honorable Thomas W. Rumpke, Judge*

*Representing Appellant:*

> *Jeffrey S. Pope and Isaac N. Sutphin, Holland & Hart, LLP, Cheyenne, Wyoming. Argument by Mr. Pope.*

*Representing Appellee:*

> *Kendal R. Hoopes, Yonkee & Toner, LLP, Sheridan, Wyoming. Argument by Mr. Hoopes.*

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE:** This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FOX, Justice.**

[¶1]   EOG Resources, Inc. (EOG) conducted oil and gas operations on the Floyd C. Reno & Sons, Inc. (Reno) ranch pursuant to a 2010 surface use agreement.  In 2019, EOG proposed an amended surface use agreement that would grant it additional rights over the property.  Reno rejected the proposal.  In response, EOG filed a complaint under the Wyoming Eminent Domain Act, seeking to condemn rights-of-way, easements, and surface use rights on approximately 2,100 acres of Reno property.  The district court began the hearing on EOG's complaint, then continued it.  Nearly four months later, EOG amended the complaint, now seeking to condemn only a 70-acre pipeline easement.  The district court dismissed EOG's complaint, concluding that EOG had not complied with the Eminent Domain Act's good-faith negotiation requirement.  We affirm.

## *ISSUE*

[¶2]   Did the district court err by concluding that EOG failed to satisfy the Wyoming Eminent Domain Act's good-faith negotiation requirement?

## *FACTS*

[¶3]   EOG holds various oil and gas leases throughout Campbell and Converse Counties, some of which underlie the Reno ranch.  Since 2010, EOG has conducted oil and gas operations on Reno's land pursuant to a surface use agreement.  In 2019, EOG proposed entering into an "Amended and Restated Surface Use Agreement," that would grant it additional "surface use rights," "access rights-of-way and easements."  Under the amended surface use agreement, EOG would drill horizontal wells in the Niobrara and Mowry oil and gas formations to develop up to approximately 400 additional wells on the Reno ranch, along with extensive associated infrastructure.

[¶4]   EOG sent Reno an "Initial Offer Letter" informing it of the proposed project.  The letter stated:

> EOG is seeking to acquire access rights-of-way and easements across [Reno] property . . . as well as surface use rights associated with the well site locations and other related infrastructure necessary for (i) the development and transportation of oil and gas, and (ii) the associated use, treatment and disposal of water associated with the development and transportation of oil and gas. This letter constitutes an offer to purchase those easements and surface use rights.

1

For these rights, EOG offered Reno "an initial payment of up to $7,352,115.00 for full project development" and "annual payments of up to $2,202,480.00 . . . for full project development," but stated that EOG would "pay based on actual development[.]" The proposed surface use agreement offered Reno an initial payment of $40.00 per rod and $7.50 per rod annually for buried oil, water, or gas pipelines "[i]n the event that [EOG] desire[d] to construct" such infrastructure.

[¶5]    The letter also referred to pending litigation between EOG and Reno concerning the extent of EOG's rights and interests under the 2010 surface use agreement. EOG asserted that "all of the rights and surface uses set forth" in the agreements attached to its offer were necessary for its proposed project, noting that "[s]ome – but not all – of those necessary rights and surface uses are covered at least in part by provisions of the 2010 SUA; others are intertwined, or are altogether different, than those set forth in the enclosed agreements." It stated that if Reno was "willing to clearly stipulate . . . which specific rights and surface uses . . . [were] covered by the 2010 SUA," EOG would "consider withdrawing those stipulated rights and uses from this offer." The letter advised that Reno was "not obligated to accept this offer" but that if Reno did not provide a timely response and good-faith negotiations failed, "EOG may move forward with legal proceedings to obtain surface use and access rights."

[¶6]    Attached to the letter was a "map showing the overview of EOG's proposed operations, including well site locations, access roads, pipeline and other infrastructure corridors, compressor stations, communication towers, water sources, water ponds and other necessary surface uses[.]"



Exhibit 17.[1]  Also attached to the letter was a "financial summary chart," the proposed "Amended and Restated Surface Use Agreement," a proposed "Water Wells and Water Ponds Agreement," and a proposed "Facility Site Lease."  The letter stated that these documents "depict[ed] the size and location of the easements and surface use rights EOG [was] seeking" and "provid[ed] information about the project and the project's potential impact in sufficient detail for reasonable identification on [Reno] property."

[¶7]  Reno rejected EOG's offer and proposed a counteroffer that, among other modifications, sought considerably higher compensation for the project.  Reno also noted that the existing surface use agreement between EOG and Reno was "incredibly broad" and that it already authorized EOG to "undertake most of [its] proposed development plan as long as [EOG] strictly complie[d]" with the agreement.  EOG responded with a "Final Offer Letter," stating that it was "of the opinion that the compensation and other terms offered [in Reno's counteroffer] greatly exceed[ed] any reasonable market value for the rights-of-way, easements and other surface use rights sought by EOG."  EOG again stated that it would "consider withdrawing" from the offer any rights that Reno was willing to stipulate EOG already had under the 2010 surface use agreement.  Absent such stipulation, EOG offered to acquire the interests identified in its initial offer on largely the same terms.[2]

[¶8]  EOG filed a "Complaint in Condemnation," seeking to condemn "[n]on-exclusive surface use rights, easements, and rights-of-way, including well-site locations" over approximately 2,110.96 acres.  Attached to the complaint was the same map provided to Reno in EOG's initial offer letter.  The complaint alleged compliance with various requirements of the Wyoming Eminent Domain Act, including the Act's good-faith negotiation requirement.  Pursuant to W.R.C.P. 71.1, EOG requested "an expedited hearing to determine [its] right to condemn the interests sought" and an order granting it immediate possession and use of the property, with a hearing to determine the value of compensation later on.

[¶9]  The district court held a hearing on EOG's request for immediate possession.  EOG presented evidence that its horizontal-well project was designed to "minimize the impact to the surface" of the Reno ranch, that EOG's existing surface use rights were insufficient for the project, and that the project would result in significant royalty and tax payments to the State.  EOG also presented evidence that, in addition to its initial and

---

[1] The map provided to Reno was color-coded and included a legible map key.  This black-and-white reproduction serves only as a visual aid.

[2] EOG "accede[d] to [Reno's] request to remove (rather than bury) [water] pond liners upon abandonment" and rescinded its "Commitment to Deliver Produced Water to Ponds in Limited Area."  These changes to EOG's final offer are not at issue in this appeal.

final offer letters, it had attended meetings with Reno to discuss the scope of the project and answer any questions about it.

[¶10] EOG's division manager of facilities and pipeline, William Pritchard, testified concerning the map that EOG had provided Reno with its initial and final offer letters. He explained that the map "show[ed] all the infrastructure that is required to develop the . . . mineral assets underlying [the Reno] acreage." He believed that EOG was not seeking any rights in the condemnation action that it had not explained or shown to Reno in prior negotiations.

[¶11] Peter Garbee, an EOG landman, also testified concerning the offer made to Reno and the map and other documents provided to Reno with the offer. Mr. Garbee explained that the map showed "all of the proposed operations" and that the financial summary spreadsheet "was the breakdown of the payments and showed the acreage . . . for the proposed sites." He asserted that the map, financial summary spreadsheet, and proposed agreements "would sufficiently enable [Reno] to evaluate the effect of the proposed project" and that "if there was anything that [Reno] still had questions about, [it] could ask." Finally, he acknowledged that the $7,352,115.00 offer to Reno was "contingent" on actual development, meaning that the full amount would only be paid if and when EOG completed every piece of proposed infrastructure. Thus, instead of a lump-sum payment of $7,352,115.00, Reno would receive discrete sums for separate pieces of the project, as broken down in the financial summary spreadsheet, raising the possibility that Reno could receive far less.

[¶12] The president of Reno, Pete Reno, testified about the oil and gas operations EOG conducted on the Reno ranch pursuant to the 2010 surface use agreement, stating that EOG had "conducted every kind of oil and gas operation that they ever wanted to do on these lands in the past, they're doing it now as we speak and they are allowed to do it tomorrow." He also testified that he could not tell from the map where proposed rights-of-way and other facilities were to be located. He explained that the map was "small," "jumbled up," and that there were "a lot of things on it." He acknowledged that EOG provided Reno several "larger" maps at "in-person meetings," that showed "different things." Mr. Reno also testified that it was "hard to tell" what compensation EOG was offering Reno because it was unclear whether Reno would "ever get the $7 million."

[¶13] After Mr. Reno's testimony, the district court continued the hearing to allow Reno additional time to designate an expert. Meanwhile, EOG filed a motion for leave to amend its complaint, which the district court granted. The amended complaint stated that "EOG has constructed and will continue to construct well pads, roads, pipelines, and other infrastructure" under the 2010 surface use agreement, but that it needed to condemn 70 acres for construction and operation of a water pipeline (the BNN Pipeline). EOG attached a map to its amended complaint depicting only the 70 acres it now sought to

4

condemn. EOG acknowledged that prior "negotiations contemplated a larger taking than EOG now seeks in [the] Amended Complaint" but asserted that "the taking requested in [the] Amended Complaint remains a small subset of the property EOG originally sought to acquire in those negotiations and letters."

[¶14] The district court reconvened the condemnation hearing shortly after EOG filed its amended complaint. The court questioned EOG about the rights it sought under the amended complaint and whether EOG had previously offered Reno compensation for those particular rights. EOG explained that it had amended its complaint because Mr. Reno's testimony at the condemnation hearing made clear that the 2010 surface use agreement granted EOG most of the rights it needed to complete its project. "Once [EOG] understood that," it "chose to strip out everything that Mr. Reno said they could do under the 2010" agreement. However, the agreement did not grant EOG the "on, over and through rights" it needed to complete the BNN Pipeline, which was critical to the project. EOG argued that even though it "reduced the scope of what [it was] seeking to condemn," it had complied with the Wyoming Eminent Domain Act because the 70 acres it sought for the BNN Pipeline were included in its initial and final offers and depicted on the maps provided to Reno. It also asserted that the amount of compensation Reno would receive for the 70 acres was clear in the offer because the financial summary spreadsheet proposed an initial payment of $40.00 per rod and $7.50 per rod annually for buried oil, water, or gas pipelines.

[¶15] In its oral ruling at the end of the proceedings, the district court concluded that EOG had "carried its burden of proving that its project is in the public interest and is of necessity." It also concluded that EOG's amended complaint adequately described the property it sought to condemn.[3] However, the court held that EOG had failed to satisfy the Eminent Domain Act's good-faith negotiation requirement, reasoning:

> The Court agrees with [Reno] that EOG failed to make an offer to acquire the property sought under Wyoming Statute 1-26-509(c)(iii)(E). In [its] original Complaint, EOG sought to acquire 2,110.96 acres of land. Later, EOG amended its Complaint to acquire 70 acres of land, much less than the original Complaint. However, nowhere in [its initial offer] did EOG make an offer to acquire the 70 acres of land . . . .
>
> Here the Court does not credit Mr. Garbee's testimony that an offer was made. Instead, the Court looks to the plain

---

[3] The district court concluded that EOG's original complaint did not adequately describe the location of proposed water retention ponds but that the amended complaint cured this deficiency because EOG no longer sought to condemn land for water retention ponds.

5

language of the initial offer. The letter specifically states . . . an initial payment of up to $7,352,115 for full project development for the rights and privileges described in the amended SUA[,] water agreement[,] and lease. There was no offer to purchase an easement over any sort [of] land. Instead, it is an offer to eventually pay for personal rights to use [Reno's] land for its oil and gas development. Moreover, the very next line of the initial offer letter states that EOG will pay on actual development . . . .

As EOG repeatedly emphasized during this case, the initial offer letter did not require payment until EOG used the land. Conversely, in this condemnation action, EOG sought to have this Court order that certain lands be handed over to EOG at the conclusion of the hearing. At no time during the negotiations did EOG offer to pay money or offer anything else of value to actually acquire the land it now seeks to have this Court condemn.

As the parties know, acquiring rights to go on someone else's land under a surface use agreement has a very different impact on the land. Unless released by the surface owner, the original contracting party always remains responsible for damages. [*Pennaco Energy, Inc. v. KD Co., LLC*, 2015 WY 152, 363 P.3d 18 (Wyo. 2015)].

Conversely, a condemnor obtains an easement running with . . . land which he may freely convey and alienate without regard to the surface owner's wishes. . . . [T]he initial offer letter sought apples in the form of surface use rights under a contract, and the condemnation Complaint, even as amended, seeks oranges in the form of easements across [Reno] lands that touch and concern and run with those lands. Thus, EOG never made an offer to acquire the property sought that it now seeks in this condemnation action. It only made an [offer] to obtain different rights to use some of the same property.

The district court denied EOG's request for immediate possession and dismissed its complaint. EOG timely appealed.

6

## STANDARD OF REVIEW

[¶16]  The parties disagree as to the applicable standard of review.  EOG asserts that the district court dismissed its amended complaint "based on its erroneous interpretation of Wyo. Stat. [Ann.] § 1-26-509(c)(iii)(E)," warranting de novo review.  Reno asserts that the "matters to be determined in a condemnation hearing . . . are issues of fact" to which we should defer unless clearly erroneous.  We have articulated the following standard when reviewing a district court's determination of issues arising from eminent domain proceedings:

> Eminent domain proceedings are authorized by constitutional and statutory provisions and governed by W.R.C.P. 71.1.  The district court determines all issues arising on the complaint for condemnation including notice, the plaintiff's right to make the appropriation, plaintiff's inability to agree with the owner, the necessity for the appropriation, and the regularity of the proceedings.  W.R.C.P. 71.1(e)(2)(A).  Only the issue of compensation may be tried before a jury.  W.R.C.P. 71.1(j).

> When we review the district court's determination of issues required by Rule 71.1(e)(2), "we uphold the judgment if there is evidence to support it, and in doing so we look only to the evidence submitted by the prevailing party and give to it every favorable inference which may be drawn therefrom, without considering any contrary evidence." *Town of Wheatland v. Bellis Farms, Inc.*, 806 P.2d 281, 284 (Wyo. 1991).  Where the district court's ultimate conclusions decide questions of law, we afford no deference to its decision.  *See Coronado Oil Co. v. Grieves*, 603 P.2d 406, 410 (Wyo. 1979); *see also Homesite Co. v. Board of County Comm'rs of Laramie*, 69 Wyo. 236, 240 P.2d 885, 889 (1952).

*Conner v. Bd. of Cty. Comm'rs, Natrona Cty.*, 2002 WY 148, ¶ 8, 54 P.3d 1274, 1278-79 (Wyo. 2002) (quoting *Wyo. Res. Corp. v. T-Chair Land Co.*, 2002 WY 104, ¶¶ 7-8, 49 P.3d 999, 1001 (Wyo. 2002)); *see also Bridle Bit Ranch Co. v. Basin Elec. Power Coop.*, 2005 WY 108, ¶ 50, 118 P.3d 996, 1016 (Wyo. 2005) (concluding that the record demonstrated condemnor's good-faith efforts to negotiate with condemnees).  The extent to which an initial offer to acquire property must align with property sought in condemnation is a legal question that we review de novo.  We uphold a district court's

factual determination that a condemnor failed to engage in good-faith negotiations if there is evidence to support it.

## *DISCUSSION*

[¶17] EOG argues that it complied with the Wyoming Eminent Domain Act because there is no requirement that an initial offer must precisely mirror the property ultimately sought through condemnation. It asserts that "the 'property sought' through both offer letters and through condemnation was an easement across [Reno's] property" because the proposed amended surface use agreement "would have created easements, including easements for pipelines[.]" It contends that the district court engrafted non-existent requirements onto the Act, including a limitation on "the method and type of property right a party must seek to condemn" and a requirement that the price offered in negotiation "must be fixed and not payable over time." Reno counters that EOG's initial and final offers "were substantially and materially different than the eventual condemnation action to take 70 acres for the BNN pipeline easement," thus depriving Reno of the "opportunity to avoid litigation by accepting an offer pertaining to the BNN pipeline easement."

[¶18] "Eminent domain is the State's right and power to appropriate private property to promote the general welfare." *Wyo. Res. Corp.*, 2002 WY 104, ¶ 9, 49 P.3d at 1001 (citing *Coronado Oil Co.*, 603 P.2d at 410). The power of eminent domain is recognized in Article 1, Section 32 of the Wyoming Constitution, which states:

> Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and for reservoirs, drains, flumes or ditches on or across the lands of others for agricultural, mining, milling, domestic or sanitary purposes, nor in any case without due compensation.

Sections 1-26-814 and -815 of the Wyoming Eminent Domain Act extend the right to acquire easements via eminent domain to oil and gas companies. Wyo. Stat. Ann. §§ 1-26-814 and -815 (LexisNexis 2019). To exercise eminent domain, the condemnor must show that: 1) "public interest and necessity require the project"; 2) the project is designed in a manner "compatible with the greatest public good and the least private injury"; and 3) the property sought is "necessary for the project." Wyo. Stat. Ann. § 1-26-504(a).

[¶19] Further, section 1-26-509 requires a condemnor to "make reasonable and diligent efforts to acquire property by good faith negotiation" before instituting condemnation proceedings. Wyo. Stat. Ann. § 1-26-509(a); *see also* Wyo. Stat. Ann. § 1-26-510 ("[A]n action to condemn property may not be maintained over timely objection by the

8

condemnee unless the condemnor made a good faith effort to acquire the property by purchase before commencing the action."). These good-faith negotiations must include written notice:

> (i) To the extent reasonably known at the time, the proposed project, the land proposed to be condemned, plan of work, operations and facilities in a manner sufficient to enable the condemnee to evaluate the effect of the proposed project, plan of work, operations and facilities on the condemnee's use of the land;
>
> . . .
>
> (iii) An initial written settlement offer that shall include:
>
>> (A) A description of the general location and extent of the property sought, with sufficient detail for reasonable identification;
>>
>> (B) An offer that, at the condemnee's request, a representative of the condemnor will tour the property sought with the condemnee . . . ;
>>
>> (C) An estimate of the fair market value of the property sought and the general basis for such estimate;
>>
>> (D) A discussion of the reclamation planned by the condemnor for the property disturbed by the condemnor's project;
>>
>> (E) An offer to acquire the property sought, allowing the condemnee up to sixty-five (65) days . . . to respond or make a counter-offer in writing; and
>>
>> (F) A written notice that the condemnee is under no obligation to accept the initial written offer . . . .

Wyo. Stat. Ann. § 1-26-509(c). Condemnation proceedings are conducted pursuant to W.R.C.P. 71.1, which allows the court to grant a condemnor immediate possession of the property sought if it determines all statutory requirements have been met, pending resolution of the issue of compensation. W.R.C.P. 71.1(e)(2)(A)-(E), (j). The district

9

court concluded that EOG did not satisfy section 1-26-509's good-faith negotiation requirement because "EOG failed to make an offer to acquire the property sought under [subsection] (c)(iii)(E)."

[¶20]  Although our caselaw does not address the good-faith negotiation requirement in great depth, it is a common statutory prerequisite to the exercise of eminent domain. *Nichols on Eminent Domain*, Ch. 24, § 24.11[3], at 24-132 (Matthew Bender, 3rd ed.). Its purpose is to encourage parties to resolve disputes by agreement, thus preventing needless condemnation proceedings and expenses.  *Id.* at § 24.13[1][a], at 24-155.  In *Conner*, we deferred to the district court's finding that "[a]though the parties were unable to agree," the condemnor "complied with the negotiation requirements of § 1-26-509 through discussions, meetings, proposals, and counterproposals and no bad faith or abuse of discretion was shown."  *Conner*, 2002 WY 148, ¶ 22, 54 P.3d at 1283; *see also Bridle Bit Ranch Co.*, 2005 WY 108, ¶¶ 49-50, 118 P.3d at 1016 (concluding that the record evidenced condemnor's good-faith attempts to negotiate for the property it later sought to condemn).  Neither of these cases addressed the extent to which a condemnor's initial offer must align with the property sought in the condemnation action.  Other jurisdictions considering this question have reached different conclusions.

[¶21]  Some courts have concluded that variations between property sought in initial offers and that sought in condemnation proceedings is not fatal to the condemnation action.  For example, in *Bd. of Cty. Comm'rs of Mesa Cty. v. Blecha*, the Colorado Court of Appeals held that the condemnor had satisfied the good-faith negotiation requirement where it had initially offered to acquire a twenty-foot-wide easement but then sought to condemn only a ten-foot-wide easement that "had been part of the original twenty[.]" 697 P.2d 416, 418 (Colo. App. 1985).  Similarly, in *Blaize v. Pub. Serv. Co. of Indiana, Inc.*, the court considered whether "variances . . . between the original offer and the complaint filed" were fatal to the condemnation action.  301 N.E.2d 863, 865 (Ind. App. 1973).  The variances included:

> the alleged fact that [the condemnor] did not specifically show [the condemnee] where the power line would cross his property, that the complaint . . . specified four towers on parcel 91, while the proposal was not specific on the matter; that the proposal specified certain rights of [the condemnor], such as ingress and egress, removal of endangering obstructions, etc., while the complaint was silent on these points; and a variance on the description on parcel 93.

*Id.*  The court considered testimony detailing the condemnor's numerous offers to place the easement in a location acceptable to the condemnee and the condemnee's testimony indicating that he understood where the easement would be located.  *Id.* at 866.  It held

that "[w]hile there were some differences in the [condemnor's] offers" it had negotiated in good faith under the "particular circumstances" of the case. *Id.* *See also* 27 Am. Jur. 2d *Eminent Domain* § 397 Negotiation over precise interest or parcel (May 2020 Update) (collecting cases where "a difference between the subject matter of the preliminary negotiations and the property or interest sought in the condemnation proceeding" was not fatal).

[¶22]  Other courts have come to the opposite conclusion.  In *Dzur v. Northern Indiana Pub. Serv. Co.*, the condemnor offered to purchase a 200-foot-wide easement from the condemnee, but then sought to condemn a 150-foot-wide easement.  278 N.E.2d 563, 566 (Ind. 1972).   The court held that before the condemnor could proceed with its condemnation action, it had to first make an offer to purchase a 150-foot-wide easement. *Id.*   It reasoned that "[t]here can be no compliance with [the good-faith negotiation] requirement unless the subject of negotiation is clear to both parties" and that the offer might have been accepted had it "related to the property" subject to the condemnation proceedings.  *Id.*; *see also City of Cape Girardeau v. Robertson*, 615 S.W.2d 526, 530 (Mo. Ct. App. 1981) (holding condemnor failed to satisfy good-faith negotiation requirement where it sought to condemn a "permanent construction easement" but had not offered "any remuneration for burdening the parcels in question with a perpetual easement"); 27 Am. Jur. 2d *Eminent Domain* § 397 (saying "negotiations preceding an action to take property ordinarily must relate to the precise parcel or interest that the condemnor seeks to acquire by condemnation" and collecting cases).

[¶23]  These cases merely reveal that whether an offer for property different from that sought in condemnation satisfies the good-faith negotiation requirement depends on the particular facts and circumstances of each case.  *See Nichols* Ch. 24, § 24.11[4], at 24-134, *supra* ("The essence of good faith is an abstract and intangible quality which defies statutory definition.   Every good faith prerequisite challenge presents a unique set of facts, parties, and circumstances to the trier of fact.").   The facts and circumstances of this case support the district court's conclusion that EOG failed to satisfy the good-faith negotiation requirement.

[¶24]  The property EOG ultimately sought to condemn was a needle in the haystack of the original offer.  While true that the 70 acres sought in the condemnation proceeding were contained within the roughly 2,100 acres addressed in EOG's initial offer, Reno could not have known that it had the option to accept the offer only as to those 70 acres (nor is it evident that it was, in fact, an option at the time).  It was not at all clear that the discrete 70 acres were the subject of the negotiations.  *See Dzur*, 278 N.E.2d at 566. Indeed, it seems that even EOG was uncertain as to what it was negotiating for, given its confusion concerning the extent of its rights under the existing surface use agreement and

its withdrawal of the vast majority of the acreage from its condemnation action once those rights became clear.[4] *See, e.g.*, Plaintiff EOG Resources, Inc.'s Motion for Leave to Amend EOG's Complaint in Condemnation, at ¶ 11 ("Reno's testimony at the August hearing clarified uncertainty over EOG's rights under the parties['] existing surface use agreement (the 'SUA'), allowing EOG to pursue certain surface access through the SUA instead of through condemnation."). Contrary to EOG's assertions, we do not find it reasonable to expect Reno to have deduced that the offer contained a discrete sub-offer for the 70-acre pipeline easement from the map, financial summary chart, and proposed agreements covering 2,100 acres and containing a multitude of well-site locations, access roads, pipelines, compressor stations, communication towers, water sources, water ponds, etc.

[¶25] EOG claims the district court's holding deprives condemnors and condemnees of the ability to negotiate to acquire the property sought via contract because it erroneously relied on the difference between an offer for a surface use agreement and a condemnation action for an easement to conclude that there was no good-faith offer for the property sought.[5] EOG asserts this conclusion will require a burdensome, exact match between a purchase offer and property rights to be condemned. It does not. The type of property right sought to be acquired is one of several factors that could bear on whether an initial offer sufficiently described the property sought in a subsequent condemnation action. We do not hold that the property sought to be condemned must be identical to the property described in the offer. We do hold, as a matter of law, that there must be a sufficient resemblance between the two to allow a court to conclude that the subject of the negotiation was clear to both parties and that the offer might have been accepted as it related to the property ultimately sought to be condemned. The record supports the conclusion that EOG failed to meet that standard. *See Conner*, 2002 WY 148, ¶ 8, 54 P.3d at 1278 (saying we uphold the district court's determination of issues under W.R.C.P. 71.1(e)(2) if there is evidence to support it); *Black Diamond Energy of Delaware, Inc. v. Wyo. Oil & Gas Conservation Comm'n*, 2020 WY 45, ¶ 45, 460 P.3d 740, 753 (Wyo. 2020) ("[W]e are free to affirm a district court's ruling on any basis appearing in the record.") (internal quotation marks omitted).

---

[4] The parties disputed the extent of EOG's rights under the existing surface use agreement. *See, e.g.*, Initial Offer Letter, at 3 ("[A]s you know, [Reno] and EOG are parties to pending litigation . . . which concerns EOG's rights and interests under a certain Surface Use Agreement dated September 21, 2010."). In its counteroffer, Reno informed EOG that it believed "the existing SUA authoriz[ed EOG] to undertake most of [its] proposed development" so long as it strictly complied with the SUA. Instead of ironing out the extent of its rights under the existing SUA, EOG apparently sought to bypass the issue by condemning the rights instead.

[5] EOG also points out that its initial offer did contain an offer to acquire an easement. *See, e.g.*, Initial Offer Letter, at 1 ("EOG is seeking to acquire access rights-of-way *and easements* across [Reno] property . . . as well as surface use rights . . . .") (emphasis added).

[¶26] Reno requests an order allowing it to submit a statement to recover reasonable attorney's fees and costs incurred in this appeal. "Wyoming generally subscribes to the American rule regarding the recovery of attorney fees, under which . . . each party pays his or her own fees. A prevailing party may, however, be reimbursed for attorney fees when provided for by contract or statute." *Douglas v. Jackson Hole Land Trust*, 2020 WY 69, ¶ 20, 464 P.3d 1223, 1229-30 (Wyo. 2020) (quoting *Thorkildsen v. Belden*, 2012 WY 8, ¶ 10, 269 P.3d 421, 424 (Wyo. 2012)). "[I]f attorney's fees are expressly authorized by contract or statute, such provision also applies to fees incurred at the appellate level." *DeWitt v. Balben*, 718 P.2d 854, 864 (Wyo. 1986). The Eminent Domain Act requires a condemnor to "reimburse the condemnee for all reasonable litigation expenses if a court finds the condemnor failed to negotiate in good faith[.]" Wyo. Stat. Ann. § 1-26-509(g). By its plain terms, Reno is entitled to reimbursement under the Act and, thus, may submit a statement for attorney's fees and costs incurred on appeal.

[¶27] Affirmed.