# IN THE SUPREME COURT, STATE OF WYOMING

## 2021 WY 64

APRIL TERM, A.D. 2021

May 10, 2021

EME WYOMING, LLC,

Appellant
(Plaintiff),

v.

BRW EAST, LLC; BRW WEST,
LLC; INDIAN MEADOWS EAST,
LLC; INDIAN MEADOWS WEST,
LLC and WARREN B. BARTLETT,

Appellees
(Defendants).

BRW EAST, LLC; BRW WEST,
LLC; INDIAN MEADOWS EAST,
LLC; INDIAN MEADOWS WEST,
LLC and WARREN B. BARTLETT,

Appellants
(Defendants),

v.

EME WYOMING, LLC,

Appellee
(Plaintiff).

S-20-0197, S-20-0198

*Appeal from the District Court of Goshen County*
*The Honorable Patrick W. Korell, Judge*

*Representing EME Wyoming, LLC:*
    Isaac N. Sutphin, P.C., and Jeffrey S. Pope, Holland & Hart LLP, Cheyenne, Wyoming.  Argument by Mr. Pope.

*Representing BRW East, LLC; BRW West, LLC; Indian Meadows East, LLC; Indian Meadows West, LLC; and Warren B. Bartlett:*
    Randall B. Reed, Kristopher C. Koski, and Kaylee A. Harmon, Long Reimer Winegar LLP, Cheyenne, Wyoming.  Argument by Mr. Koski.

*Representing Amicus Curiae Petroleum Association of Wyoming:*
    Michael D. Smith and Casey R. Terrell, Crowley Fleck PLLP, Cheyenne, Wyoming.

*Representing Amicus Curiae Wyoming Stock Growers Association:*
    Conner G. Nicklas and Teresa L. Slattery, Falen Law Offices, LLC, Cheyenne, Wyoming.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**DAVIS**, **Chief Justice**.

[¶1]    In the development of oil and gas resources, Wyoming is a first-to-file state.  This means that when two or more entities have the right to produce oil and gas in an area, the Wyoming Oil and Gas Conservation Commission (WOGCC) will grant sole operating rights to the first entity to collect the necessary information and file an application for a permit to drill (APD).[1]  The eminent domain dispute now before us arose in part, if not entirely, from these "race to permit" concerns.

[¶2]    EME Wyoming, LLC, an oil and gas company, sought access to roughly 52,000 acres of land located primarily in Goshen County, Wyoming for the stated purpose of gathering data to evaluate the property's suitability for condemnation under the Wyoming Eminent Domain Act.  The property owners, BRW East, LLC, BRW West, LLC, Indian Meadows East, LLC, Indian Meadows West, LLC, and Warren Bartlett (collectively the BRW Group) believed that EME sought access to the lands, not for a proper purpose under the Act, but solely to collect data with which to file APDs, and it denied EME's request. In response, EME sued under the Act to obtain access.

[¶3]    The district court issued two orders. In its first order, it allowed EME access to the 52,000 acres to survey and gather data, but restricted it from using the survey information or filing APDs with the WOGCC, pending further order of the court.  In its second order, the court permanently barred EME from using the information it collected to file APDs.

[¶4]    The BRW Group appeals the first order allowing EME access to its 52,000 acres, and EME appeals the second order barring it from using the survey and other data to file APDs.  We reverse the first order allowing EME access to the BRW Group's property, affirm the second order to the extent that it restricted EME's use of the data it collected, and remand for proceedings consistent with this opinion.

## ISSUE

[¶5]    The dispositive issue in this appeal is:

> Did EME establish that it was a condemnor as that term is defined by statute, and that it was thus entitled to an order allowing access to the BRW Group's 52,000 acres of land?

---

[1] *See generally Devon Energy Prod. Co., LP v. Grayson Mill Operating, LLC*, 2020 WY 28, 458 P.3d 1201 (Wyo. 2020).

## FACTS

[¶6]   Elk Mesa Energy is an oil and gas company operating in the Rocky Mountain region, and EME is its wholly owned subsidiary authorized to do business in Wyoming. EME became interested in the BRW Group's properties because EME's technical and geologic work identified the area as having potential for hydrocarbons.

[¶7]   On July 8, 2019, EME wrote the BRW Group to request permission to access 52,000 plus acres of its land.  It stated in part:

> As you already know, Elk Mesa Energy, LLC ("Elk Mesa") is preparing to develop an oil and gas exploration and production project, together with all related infrastructure and facilities, on or in the immediate vicinity of your property. The proposed oil and gas operations will be conducted on property you own or lease as well as on adjacent properties. Thus, access and surface uses associated with the project may be required on, over, and across your property. The approximate location of the proposed project is shown on the enclosed map.
>
> * * * *
>
> Elk Mesa has a strong desire to reach an agreement with you regarding survey access. Wyoming law requires that Elk Mesa allow you fifteen (15) days to grant written authorization for Elk Mesa and its subcontractors to conduct the requested surveys. See Wyoming Statute § 1-26-506. If Elk Mesa's efforts to reach an agreement for survey access are obstructed or denied, Elk Mesa will apply to the district court for an order permitting entry pursuant to Wyoming Statute § 1-26-507.

[¶8]   The BRW Group denied EME's request for access, and on August 1, 2019, EME applied to the district court under the Eminent Domain Act and W.R.C.P. 71.1 for an order permitting entry.  The BRW Group objected on several grounds.  Most relevant to this appeal, it asserted that EME intended to use the survey information it collected to file APDs with the WOGCC, and it argued that was an impermissible use of access under the Act.  It further asserted that although EME requested access to nearly all its property, it had no mineral or leasehold interest in most of it.

[¶9]   On September 3, 2019, the district court held a hearing on EME's application.  EME offered no mineral leases or other documentation of its asserted mineral holdings and instead offered generalized testimony and exhibits concerning its mineral interests and their

2

locations.  For example, EME presented Exhibits 3 and 4, which depicted areas shaded in yellow to reflect its purported holdings.



**EME Exhibit 3**



**EME Exhibit 4**

[¶10] Robert Gardner, president and chief executive officer of EME, testified as follows concerning the exhibits:

> Q. Mr. Gardner, are these mineral holdings that are represented in the yellow shading the only mineral holdings that Elk Mesa, as a company, has?
>
> A. In this particular area, yes.
>
> Q. Are there any efforts underway to expand Elk Mesa's holdings in this general vicinity?
>
> A. Yes. Those efforts are ongoing.
>
> Q. And what is the source of the information that sets forth Elk Mesa's mineral holdings in this vicinity?
>
> A. It's a combination of private mineral records combined with federal, state and county ownership records.
>
> Q. Okay. Is there anything else about this exhibit that you think would be helpful for the judge to understand your request today?
>
> A. This exhibit [Exhibit 3] represents close to 40,000 net mineral acres spread amongst several townships underlying several surface owners and consists of 56 separate and discreet [sic] mineral owners that we have reached agreements with.
>
> Q. Okay. So let's take a look now at Exhibit No. 4. Mr. Gardner, this exhibit looks fairly similar. Can you please explain what we are looking at in Exhibit No. 4?
>
> A. Yes. So this is the same map from Exhibit 3. We're just building on the foundation and knowledge. And to the best of our knowledge from the Goshen County Assessor's website we've overlaid the boundaries of the various Bartlett family surface ownership.

* * * *

4

Q.      Okay. So do you have any understanding about what percent of the Bartlett property overlays Elk Mesa mineral holdings?

A.      As a rough estimate, 60 to 70 percent of the surface overlays approximately 22,000 net mineral acres that the company has under its control.

[¶11]   On cross-examination, Mr. Gardner testified:

Q.      And we're dealing with an approximately 52,000-acre ranch here today. Does EME own the entirety of the lease hold [sic] mineral rights under the ranch?

A.      The entirety? No.

Q.      You indicated in your testimony earlier today, that EME owns approximately 22,000 net mineral acres. Is that underneath the yellow area on Exhibit [4]?

A.      Correct.

Q.      And how did you come up with that calculation?

A.      Our internal records.

Q.      And what was included in your internal records to aid you in that calculation?

A.      Various agreements, commercial agreements with private parties, as well as any publicly-available mapping and geographic data.

* * * *

Q.      And the 22,000 net mineral acres you indicate, those are leases with other parties; correct?

A.      They are leases and/or commercial agreements.

Q.      And what do you mean by "commercial agreement"?

5

A. It's an option to execute a lease based on the suitability of the surface.

Q. And who are these commercial agreements that Elk Mesa has entered into with?

A. Those are private agreements, Your Honor. I prefer not to – to divulge that information.

Q. So it's safe to say that Elk Mesa doesn't actually have 22,000 net mineral acres under lease underneath the Bartlett Ranch property; correct?

A. I think the answer to that question is more nuanced, [counsel].

Q. Does Elk Mesa have leases to 22,000 net mineral acres underneath Bartlett Ranch?

A. Elk Mesa has leases and commercial agreements for 22,000 net mineral acres.

[¶12] On November 8, 2019, the district court entered an Order Permitting Entry for Survey. The order authorized EME to enter the BRW Group's property subject to certain conditions, including the following:

> 3.1. [EME] may perform legal and civil surveys, archaeological surveys, and environmental surveys, for the purposes of surveying the property and determining whether it is suitable and within the power of the condemnor to condemn;
>
> 3.2. Pending further order of the Court, [EME] is expressly prohibited from utilizing any survey information whatsoever and submitting it to the Wyoming Oil and Gas Conservation Commission ("WOGCC") to be used to apply for any Application for Permit to Drill ("APD").

[¶13] On March 2, 2020, EME provided notice that it had completed its surveys of the property. On March 18, 2020, the district court held a follow-up hearing to consider any additional arguments before issuing a final order and to hear motions the parties filed against each other that are not relevant to this appeal. On May 22, 2020, the court issued its final order. Relevant to this appeal, the court concluded:

6

Here, EME intends to use pre-condemnation entry to obtain survey data so that it may submit APDs to the WOGCC. This Court concludes that such intended use exceeds the activities allowed by Wyoming's Eminent Domain Act. Under the statute, EME has the right of pre-condemnation entry for the purposes of surveying, examining, photographing, testing, sounding, boring and sampling, or engaging in other activities. The use of this information is limited to whether condemnation is appropriate and, potentially, for later use in the condemnation of a way of necessity.

[¶14] The district court then ordered:

> EME is entitled to use its survey information of the Bartlett Property for establishing and condemning "ways of necessity". Nothing in this order shall prohibit EME from using survey information for any parcels in which they have a right under Wyoming's Split Estate Act.

[¶15] EME filed a timely appeal of the district court's final order, and the BRW Group cross-appealed the court's order allowing EME's entry onto its lands.

## STANDARD OF REVIEW

[¶16] We review a district court's determination of issues arising from eminent domain proceedings as follows:

> Eminent domain proceedings are authorized by constitutional and statutory provisions and governed by W.R.C.P. 71.1. The district court determines all issues arising on the complaint for condemnation including notice, the plaintiff's right to make the appropriation, plaintiff's inability to agree with the owner, the necessity for the appropriation, and the regularity of the proceedings. W.R.C.P. 71.1(e)(2)(A). Only the issue of compensation may be tried before a jury. W.R.C.P. 71.1(j).
>
> > When we review the district court's determination of issues required by Rule 71.1(e)(2), "we uphold the judgment if there is evidence to support it, and in doing so we look only to the evidence submitted by the prevailing party and give to it every favorable inference which may be drawn therefrom, without considering any contrary evidence." *Town of Wheatland v. Bellis*

7

*Farms, Inc.*, 806 P.2d 281, 284 (Wyo. 1991). Where the district court's ultimate conclusions decide questions of law, we afford no deference to its decision. *See Coronado Oil Co. v. Grieves*, 603 P.2d 406, 410 (Wyo. 1979); *see also Homesite Co. v. Board of County Comm'rs of Laramie*, 69 Wyo. 236, 240 P.2d 885, 889 (1952).

*EOG Res., Inc. v. Floyd C. Reno & Sons, Inc.*, 2020 WY 95, ¶ 16, 468 P.3d 667, 672 (Wyo. 2020) (quoting *Conner v. Bd. of Cnty. Comm'rs, Natrona Cnty.*, 2002 WY 148, ¶ 8, 54 P.3d 1274, 1278-79 (Wyo. 2002)).

[¶17]   This appeal also presents questions of statutory interpretation, which are questions of law that we consider de novo.  *Candelaria v. Karandikar*, 2020 WY 140, ¶ 12, 475 P.3d 548, 551 (Wyo. 2020) (citing *Life Care Center of Casper v. Barrett*, 2020 WY 57, ¶ 12, 462 P.3d 894, 898 (Wyo. 2020)).

## DISCUSSION

[¶18]   "Eminent domain is the State's right and power to appropriate private property to promote the general welfare." *EOG Res.*, ¶ 18, 468 P.3d at 673 (quoting *Wyo. Res. Corp. v. T-Chair Land Co.*, 2002 WY 104, ¶ 9, 49 P.3d 999, 1001 (Wyo. 2002)).  The power of eminent domain is recognized in Article 1, Section 32 of the Wyoming Constitution, which states:

> Private property shall not be taken for private use unless by consent of the owner, except for private ways of necessity, and for reservoirs, drains, flumes or ditches on or across the lands of others for agricultural, mining, milling, domestic or sanitary purposes, nor in any case without due compensation.

[¶19]   The Wyoming Eminent Domain Act, Wyo. Stat. Ann. §§ 1-26-501 through 817, governs condemnation actions, and Sections 814 and 815 extend the right of eminent domain to oil and gas interests. *EOG Res.*, ¶ 18, 468 P.3d at 673.  As to a condemnor's right of entry, the Act provides in part:

> A condemnor and its agents and employees may enter upon real property and make surveys, examinations, photographs, tests, soundings, borings and samplings, or engage in other activities ***for the purpose of*** appraising the property or ***determining whether it is suitable and within the power of the condemnor to condemn*** . . . .

Wyo. Stat. Ann. § 1-26-506(a) (LexisNexis 2019) (emphasis added).

[¶20]   EME contends that because it is an oil and gas company, it is a condemnor under the Act, and on that basis it has a right to enter the BRW Group's properties.  It further contends that part of determining whether the property is suitable and within its power to condemn is using its survey data to file APDs with the WOGCC.  It argues that the district court therefore erred in restricting it from using the data it collected to file APDs.

[¶21]   The BRW Group responds that the Act limits an oil and gas company's right of condemnation to ways of necessity.  It thus contends that any data collected may only be used in furtherance of locating and establishing ways of necessity, and the district court correctly restricted EME's use of the data.  It goes further, however, and contends that because EME's only objective was to obtain survey data with which to file APDs, the court erred in allowing its entry onto the BRW Group's properties at all.

[¶22]   We conclude that the more fundamental question is whether EME qualifies as a condemnor.  Because we conclude that EME made no showing of mineral ownership that would so qualify it, we need not reach the question of whether an oil and gas company's right of condemnation is limited to ways of necessity or otherwise define the parameters of that right.

[¶23]   The question of who qualifies as a condemnor requires that we interpret the Eminent Domain Act.  "As a general rule, statutes conferring the power of eminent domain are to be strictly construed in favor of landowners, so that no person will be deprived of the use and enjoyment of his property except by a valid exercise of the power." *Coronado Oil Co. v. Grieves*, 603 P.2d 406, 410 (Wyo. 1979).  We also look to our usual rules of statutory interpretation.

> "When we interpret statutes, our goal is to give effect to the intent of the legislature, and we 'attempt to determine the legislature's intent based primarily on the plain and ordinary meaning of the words used in the statute.'" *Fugle v. Sublette County School Dist. No. 9*, 2015 WY 98, ¶ 8, 353 P.3d 732, 734 (Wyo. 2015) (quoting *Krenning v. Heart Mountain Irrigation Dist.*, 2009 WY 11, ¶ 9, 200 P.3d 774, 778 (Wyo. 2009)). "Where legislative intent is discernible a court should give effect to the 'most likely, most reasonable, interpretation of the statute, given its design and purpose.'" *Adekale v. State*, 2015 WY 30, ¶ 12, 344 P.3d 761, 765 (Wyo. 2015) (quoting *Rodriguez v. Casey*, 2002 WY 111, ¶ 20, 50 P.3d 323, 329 (Wyo. 2002)).

We therefore construe each statutory provision *in pari materia*, giving effect to every word, clause, and sentence according to their arrangement and connection. To ascertain the meaning of a given law, we also consider all statutes relating to the same subject or having the same general purpose and strive to interpret them harmoniously. We presume that the legislature has acted in a thoughtful and rational manner with full knowledge of existing law, and that it intended new statutory provisions to be read in harmony with existing law and as part of an overall and uniform system of jurisprudence. When the words used convey a specific and obvious meaning, we need not go farther and engage in statutory construction.

*Wyo. Jet Center, LLC v. Jackson Hole Airport Bd.*, 2019 WY 6, ¶ 12, 432 P.3d 910, 915 (Wyo. 2019) (quoting *PacifiCorp, Inc. v. Wyo. Dep't of Revenue*, 2017 WY 106, ¶ 10, 401 P.3d 905, 908-09 (Wyo. 2017)).

[¶24]  The Act defines a condemnor as "a person empowered to condemn."  Wyo. Stat. Ann. § 1-26-502(a)(iii).  EME contends that because it is an oil and gas company and the Act extends the right of eminent domain to oil and gas companies, it is an entity empowered to condemn.  We find no basis in our law for such a broad interpretation.

[¶25]  In *Coronado*, a lessee of six federal oil and gas leases sought to condemn private property to access its interests.  603 P.2d at 408-09.  The appeal presented the question of whether the power of eminent domain for mining included oil and gas development, and this Court held that it did.[2]  *Id*. at 411.  In so holding, it reasoned:

The right to condemn a way of necessity under constitutional and statutory provisions is an expression of public policy against landlocking property and rendering it useless. *Franks v. Tyler*, Okl.App.1974, 531 P.2d 1067. The obvious purpose of the constitutional and statutory provisions is to provide a means whereby *a landowner or owner of an interest in lands*, enclosed on all sides by lands of others and unable to get to the land from a public road or highway can get relief by condemning a right of way to it across intervening land.

---

[2] The eminent domain statutes then in effect referred to mining generally, but did not specifically identify oil and gas production, as section 815 of the Eminent Domain Act now does. *See Coronado*, 603 P.2d at 408 n. 2.

*McGowin Investment Co. v. Johnstone*, 1974, 54 Ala.App. 194, 306 So.2d 286, cert. den. 293 Ala. 766, 306 So.2d 290.

*Coronado*, 603 P.2d at 410 (emphasis added).

[¶26]   The Court further explained its conclusion as follows:

We think it plain beyond any doubt that the intended purpose of the cited constitutional provision and statutes was to facilitate the development of our state's resources. We will hereafter construe the word "mining" to include the exploration for oil and gas, and that now is hardly unique or expansive of that term and is nothing more than a reasonable and sound construction which carries out the intent of the constitution and related statutes, as well as permitting development of the resources of this state for the common good. ***It is only reasonable that the owner of valuable resources should not be shut in and deprived of the opportunity to exploit them for what is in a significant part a compelling public purpose***.

*Coronado*, 603 P.2d at 411 (emphasis added and footnote omitted).

[¶27]   In 2002, this Court again addressed an oil and gas operator's right to condemn under the Eminent Domain Act. *Wyo. Res. Corp.*, ¶ 3, 49 P.3d at 1000.  In doing so, we reiterated the premise underlying a mineral owner's right to condemn—that it must have an opportunity to realize the benefit of its ownership.

"[T]he right to condemn a way of necessity under constitutional and statutory provisions is an expression of public policy against landlocking property and rendering it useless." [*Hulse v. First American Title Co. of Crook County*, 2001 WY 95, ¶ 30, 33 P.3d 122, ¶ 30 (Wyo. 2001)]; *see Coronado Oil Co.*, 603 P.2d at 410.

The legislature has enacted the eminent domain and private road establishment acts so that access will be available to permit ***mineral estate owners*** to realize the full benefit of their property ownership and landlocked property will not be rendered useless.

*Wyo. Res. Corp.*, ¶¶ 13-14, 49 P.3d at 1003-04 (emphasis added); *see also Bridle Bit Ranch Co. v. Basin Elec. Power Co-op*, 2005 WY 108, ¶ 42, 118 P.3d 996, 1014 (Wyo. 2005).

[¶28]  Our decisions preceding the legislature's 1981 enactment of the Eminent Domain Act, and those since its enactment, have plainly recognized that the right to condemn for mineral development springs from mineral ownership.  EME nonetheless contends that it is a condemnor under the Act, or one "empowered to condemn," solely by virtue of its status as an oil and gas producer.  In support, it points to Section 815(a) of the Act, which provides as follows:

> ***Any person, association, company or corporation authorized to do business in this state may appropriate by condemnation a way of necessity*** over, across or on so much of the lands or real property of others as necessary for the location, construction, maintenance and use of reservoirs, drains, flumes, ditches including return flow and wastewater ditches, underground water pipelines, pumping stations and other necessary appurtenances, canals, electric power transmission lines and distribution systems, railroad trackage, sidings, spur tracks, tramways, roads or mine truck haul roads required in the course of their business for agricultural, mining, exploration drilling and production of oil and gas, milling, electric power transmission and distribution, domestic, municipal or sanitary purposes, or for the transportation of coal from any coal mine or railroad line or for the transportation of oil and gas from any well.

Wyo. Stat. Ann. § 1-26-815(a) (emphasis added).

[¶29]  We reject EME's proposed interpretation of Section 815(a).  First, it gives breadth to the power of condemnation that is contrary to our rule that condemnation statutes must be construed narrowly—a rule we have continued to adhere to since enactment of the present Eminent Domain Act.

> In an earlier appeal of the *Coronado* case, we said that eminent domain statutes are to be strictly construed in favor of the landowners to the end that no person will be deprived of the use and enjoyment of his property except by a valid exercise of that power. *Coronado Oil Company v. Grieves*, 603 P.2d 406 (Wyo. 1979). We have no question that the legislature intended to continue this rule of construction when it adopted the present Act.

*L.U. Sheep Co. v. Bd. of Cnty. Comm'rs of Cnty. of Hot Springs*, 790 P.2d 663, 671 (Wyo. 1990).

[¶30] Additionally, it ignores the requirement that we harmonize statutes relating to the same subject. *Wyo. Jet Center*, ¶ 12, 432 P.3d at 915. In 2005, the legislature enacted the Wyoming Split Estate Act, through which it codified an oil and gas operator's access to surface lands and placed conditions on that access. *See* Wyo. Stat. Ann. §§ 30-5-401 through 410 (LexisNexis 2019).[3] It applies to "[a]ny oil and gas operator having the right to any oil or gas underlying the surface of land." Wyo. Stat. Ann. § 30-5-402(a). We can think of no reason the legislature would place conditions on a mineral owner's access to surface under the Split Estate Act while at the same time allowing any entity, regardless of mineral ownership, access under the Eminent Domain Act.

[¶31] The obvious answer is that it would not. *Mackley v. State*, 2021 WY 33, ¶ 22, 481 P.3d 639, 645 (Wyo. 2021) ("We strive to avoid an interpretation that produces an absurd result, or that renders a portion of the statute meaningless.") (quoting *HB Fam. Ltd. P'ship v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2020 WY 98, ¶ 56, 468 P.3d 1081, 1096 (Wyo. 2020)). We instead conclude that the legislature intended, consistent with our holding in *Coronado*, that only those entities with landlocked mineral ownership would have the power to condemn under the Eminent Domain Act.

[¶32] That brings us to the crux of this case. Because a condemnor must be one that owns development rights to landlocked minerals, the access permitted under Section 506 of the Eminent Domain Act is not intended to be a device by which an entity may obtain access to determine if it wants to acquire mineral ownership in the area. A party seeking access

---

[3] With regard to entry to conduct nonsurface disturbing activities, the Split Estate Act provides:

> (a)     Any oil and gas operator having the right to any oil or gas underlying the surface of land may locate and enter the land for all purposes reasonable and necessary to conduct oil and gas operations to remove the oil or gas underlying the surface of that land. The oil and gas operator shall have the right at all times to enter upon the land for nonsurface disturbing activities reasonable and necessary to determine the feasibility and location of oil and gas operations to extract the oil and gas thereunder. The oil and gas operator shall first comply with the provisions of this act and shall reasonably accommodate existing surface uses. . . .

> (b)     An oil and gas operator may enter to conduct nonsurface disturbing activities, including inspections, staking, surveys, measurements and general evaluation of proposed routes and sites for oil and gas operations. Prior to initial entry upon the land for nonsurface disturbing activities, the oil and gas operator shall provide at least five (5) days notice to the surface owner. Prior to any subsequent entry upon the land for nonsurface disturbing activities not previously discussed, the oil and gas operator shall provide notice to the surface owner.

Wyo. Stat. Ann. § 30-5-402.

must show that it owns development rights and that the data it seeks to collect relates to that interest and will be used for its development. Thus, while we agree with EME that Section 506 contemplates that a condemnor may enter property before filing a condemnation action, a condemnor must nonetheless show at a minimum that it owns development rights to landlocked minerals and the location of those minerals.

[¶33] EME did not show that it owned the right to develop landlocked minerals that it could not access without condemning the BRW Group's property. It claimed 22,000 acres of holdings that it asserted were a combination of leases and options to lease, but the record does not identify the percentage of either or their precise locations. The district court therefore could not determine, and we cannot determine, whether EME owned minerals that were landlocked and whether the data it sought to collect related to development of those minerals.

[¶34] Because EME did not make the required showing for access to the BRW Group's property, it should not have been permitted access to the property. We therefore reverse the order allowing entry.

[¶35] That brings us to the question of what to do with the second order, which allowed EME to use the data it collected for the condemnation of ways of necessity, but restricted it from using the data to file APDs. We affirm the order to the extent that it restricted EME from using the data it collected to file APDs, but we have concerns with the remainder of the order allowing EME to otherwise use the data. Because EME should not have been permitted access to the property, the data is not lawfully in its possession, and it may not use it for any purpose. We therefore reverse the second order to the extent that it allows EME to use the data to support a condemnation action.

[¶36] The BRW Group requests equitable relief to prevent harm it might suffer as a result of EME's improper access and collection of data. In particular, it requests that EME be required to expunge the data that it collected and that it be enjoined from publishing, utilizing, or otherwise obtaining benefits from the data. "Requests for equitable relief are matters over which the district court exercises broad discretion." *Harber v. Jensen*, 2004 WY 104, ¶ 8, 97 P.3d 57, 60 (Wyo. 2004) (citing *Wilson v. Lucerne Canal and Power Co.*, 2003 WY 126, ¶ 9, 77 P.3d 412, 416 (Wyo. 2003)). The record does not tell us what data EME collected, and we therefore remand to the district court for a determination of what that data is, the extent to which it can be used to the detriment of the BRW Group, and what relief is appropriate to prevent that harm.

[¶37] We reverse in part, affirm in part, and remand for proceedings consistent with this opinion.

14